The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 23, 2019

## 2019COA78

**No. 15CA1178, *People v. Dominguez* — Evidence — Hearsay — Verbal Acts — Opinions and Expert Testimony — Opinion by Lay Witnesses — Testimony by Experts**

A division of the court of appeals considers whether the trial court erred in admitting text messages discovered on the defendant's cell phone stating, among other messages, "Can you do 2 for 1500 if I got all of it" and "Can you do 2 for 1600." The division rejects the defendant's argument that these text messages constituted inadmissible hearsay, concluding, instead, that they were admissible as verbal acts. The division also rejects the defendant's related due process and CRE 403 arguments related to the text messages.

The division next agrees that the trial court erred in admitting expert testimony from two police agents under the guise of lay

witness testimony. But, it concludes that the admission of this improper testimony was harmless given the overwhelming evidence of defendant's guilt presented at trial.

The division also rejects the defendant's contention that the prosecutor committed reversible misconduct during rebuttal closing argument by misstating the law on reasonable doubt.

Last, the division concludes the defendant's convictions for reckless driving and vehicular eluding need not merge. Although reckless driving is a lesser included offense of vehicular eluding, the undisputed evidence showed that the defendant committed two separate and temporally distinct instances of reckless driving, even if not separately charged. So, under the circumstances here, the trial court did not plainly err in not sua sponte merging these two convictions.

COLORADO COURT OF APPEALS　　　　　　　　**2019COA78**

Court of Appeals No. 15CA1178
Jefferson County District Court No. 14CR1695
Honorable Randall C. Arp, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Brian Anthony Dominguez,

Defendant-Appellant.

JUDGMENT AND SENTENCE AFFIRMED

Division VII
Opinion by JUDGE DUNN
Márquez* and Miller*, JJ., concur

Announced May 23, 2019

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jacob B. McMahon, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1      Brian Anthony Dominguez appeals the judgment of conviction entered after a jury found him guilty of possession of a controlled substance with intent to distribute, possession of drug paraphernalia, vehicular eluding, reckless driving, and driving under restraint. He also appeals his sentence. We affirm.

## I. Background

¶ 2      While outside the home of his daughter's grandmother, Dominguez had a verbal altercation with the grandmother's relatives. One of the relatives called 911, and Dominguez drove away at a high speed.

¶ 3      Agent Angela Garza later spotted Dominguez's truck. After following it for a short time, she attempted to initiate a traffic stop. Dominguez accelerated away, and a high-speed chase ensued. Agent Garza and other police agents ultimately stopped their pursuit. But later, Agent Garza located Dominguez's abandoned truck. Police agents found Dominguez hiding nearby and arrested him.

¶ 4      Agent Ryan Carmichael then searched Dominguez's truck and discovered the following items:

- a large bag containing 208 grams (almost half a pound) of methamphetamine;

- a small bag containing 0.29 grams of methamphetamine;

- a small bag containing 0.47 grams of methamphetamine;

- a third small bag, which was empty;

- a small spoon "that appeared . . . to be the size used to fill these smaller baggies";

- an electronic scale with a "white substance" on it, which was similar in color to the recovered methamphetamine;

- a cell phone;

- a glass smoking pipe; and

- used and unused syringes.

¶ 5    The prosecution charged Dominguez with possession of a controlled substance with intent to distribute, possession of drug paraphernalia, vehicular eluding, reckless driving, and driving under restraint.[1]  At trial, Dominguez conceded all but the possession of a controlled substance with intent to distribute

---

[1] The prosecution also charged Dominguez with aggravated motor vehicle theft, but the trial court granted Dominguez's motion for judgment of acquittal on that count.

charge.  The jury found Dominguez guilty of each count, and the court sentenced him to twelve years in prison.

## II.    Text Messages

¶ 6      Dominguez primarily contends the trial court erred in admitting text messages discovered on his cell phone because (1) they were inadmissible hearsay; (2) their admission violated his right to due process; and (3) they should have been excluded under CRE 403.  These errors, he argues, require the reversal of his possession of a controlled substance with intent to distribute conviction.  We consider and reject each contention.

### A.    Additional Facts

¶ 7      Agent Carmichael testified that when he took the cell phone from Dominguez's truck and examined it, he saw text messages that "concern[ed] [him]."  He "relayed what [he] saw to . . . agents on the West Metro Drug Task Force."

¶ 8      Agent Adrian Alderete, a member of the West Metro Drug Task Force, later testified that he executed a search warrant on the cell phone and discovered a series of text messages sent to it over a span of approximately two hours near the time of Dominguez's

arrest. The prosecutor moved to admit a photograph of Dominguez's cell phone showing the following text messages:

- "[c]an you do 2 for 1500 if I got all of it";

- "[y]our voicemail is full";

- "[c]an you do that for me";

- "[c]all me please"; and

- "[c]an you do 2 for 1600."

¶ 9    Dominguez's counsel objected, contending that the text messages were inadmissible hearsay. In response, the prosecutor argued that they were "not . . . statement[s] at all" but "in the nature of . . . verbal act[s]," so "hearsay doesn't apply."

¶ 10    The court overruled the objection, concluding that the text messages were not hearsay. It explained, "While arguably the texts are communicative in nature and an inference can be drawn from them, the Court would find that they are not assertions. None of the messages on that screen are assertions. They are all inquiries or questions."

### B.    Hearsay

¶ 11    Dominguez says this was reversible error. He argues that the text messages constituted inadmissible hearsay because they were

offered for the truth of the matter "impliedly asserted" in them — that he "was a drug dealer."[2]  We disagree.

## 1.  Standard of Review

¶ 12    The parties agree that Dominguez preserved this issue but dispute the standard by which we review it.  Dominguez argues for de novo review, contending that "whether evidence is hearsay presents a legal question."  The People respond that whether the court erred in admitting evidence is reviewed for an abuse of discretion.

¶ 13    The People are correct that we review a trial court's evidentiary ruling for an abuse of discretion.  *People v. Phillips*, 2012 COA 176, ¶ 63; *see also People v. Cohen*, 2019 COA 38, ¶ 10.  In determining if the court abused its discretion, however, we not only consider whether the court's ruling was manifestly arbitrary, unreasonable, or unfair, but also whether its ruling was contrary to the law. *People v. Jackson*, 2018 COA 79, ¶ 47.  This latter question does

---

[2] In making this argument, Dominguez addresses the text messages together, indicating that a "statement-by-statement analysis is unhelpful."  The People, too, generally analyze them together. Accordingly, we do not conduct a separate analysis for each text message, but instead review them as one.

not require deference to the trial court.  Instead, the trial court's application or interpretation of the law when making an evidentiary ruling is a question of law we review de novo.  *See People v. Reed*, 216 P.3d 55, 56-57 (Colo. App. 2008); *see also E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo. 2000); *Sos v. Roaring Fork Transp. Auth.*, 2017 COA 142, ¶ 48.

¶ 14    We therefore review de novo the trial court's application of hearsay law, but, absent a misapplication of the law, the decision to admit evidence remains in the court's broad discretion.  *See Phillips*, ¶ 63; *see also Danko v. Conyers*, 2018 COA 14, ¶ 26.

## 2.    Discussion

¶ 15    Barring application of an exception, hearsay is inadmissible.  CRE 802; *People v. Glover*, 2015 COA 16, ¶ 37.  Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  CRE 801(c); *Phillips*, ¶ 61.  A statement is defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him to be communicative."  CRE 801(a).

¶ 16    The evidentiary rules do not define "assertion," leading courts to struggle with whether an implied assertion falls within the hearsay definition.  A division of this court identified this "classic

dilemma" in *People v. Griffin*, 985 P.2d 15, 17 (Colo. App. 1998). There, the division explained the "dilemma is how to treat a statement or conduct by a person out of court, not subject to cross-examination at trial, described by a witness at trial, from which a fact finder could infer a separate fact." *Id.*

¶ 17    *Griffin* stated that CRE 801(a) "resolves the dilemma by focusing solely on whether the assertion or conduct by the out-of-court witness was intended to imply to the testifying witness a separate fact in question at trial." *Id.* at 17-18; *see also* Fed. R. Evid. 801 advisory committee's note (The definition of a statement under the federal counterpart to CRE 801 excludes "from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. The key to the definition is that nothing is an assertion unless intended to be one.").

¶ 18    Dominguez takes issue with *Griffin*'s intent-based approach. He argues it is based on an interpretation of the commentary in Fed. R. Evid. 801, which is not included in CRE 801. Further, he notes that courts in other jurisdictions have criticized the federal view. *See, e.g.*, *State v. Dullard*, 668 N.W.2d 585, 593-95 (Iowa 2003). *But see Hernandez v. State*, 863 So. 2d 484, 486 (Fla. Dist.

Ct. App. 2004) (applying the intent-based approach); *State v. Carrillo*, 750 P.2d 878, 882 (Ariz. Ct. App. 1987) (same), *aff'd in part, vacated in part on other grounds*, 750 P.2d 883 (Ariz. 1988).

¶ 19     We need not revisit *Griffin* here. This is so because we conclude that the text messages were properly admitted verbal acts (as argued by the prosecution at trial), which are not hearsay. *See People v. Thompson*, 2017 COA 56, ¶ 135; *People v. Scearce*, 87 P.3d 228, 233 (Colo. App. 2003); *see also United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).

¶ 20     "A verbal act is an utterance of an operative fact that gives rise to legal consequences." *Scearce*, 87 P.3d at 233 (citation omitted). It's offered not for its truth, but to show that it was made. *Thompson*, ¶ 135. Thus, verbal acts aren't hearsay. *Id.*; *Scearce*, 87 P.3d at 233; *see also United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999) ("Performative utterances are not within the scope of the hearsay rule, because they do not make any truth claims.").

¶ 21     The text messages sent to Dominguez's cell phone don't make any truth claims; rather, they suggest a request to purchase something at a proposed price. Such statements have a legal effect

regardless of their truth. *See Scearce,* 87 P.3d at 233 (recognizing examples of a verbal act include oral utterances constituting the offer and acceptance for a contract); *see also Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.,* 298 F.3d 201, 218 n.20 (3d Cir. 2002) ("[A] statement offering to sell a product at a particular price is a 'verbal act,' not hearsay, because the statement itself has legal effect."); *Little v. State,* 105 A.2d 501, 503 (Md. 1954) (recognizing that the "verbal act of taking a bet" was not inadmissible hearsay); 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.11(3) (2d ed. 2018) (examples of a verbal act include contract offers and illegal solicitations).

¶ 22    Even more to the point, "the purchase of a drug, legally or illegally, is a form of contract." *Garner v. State,* 995 A.2d 694, 700 (Md. 2010) (citation omitted). And, "[t]he . . . words of [a] . . . would-be [drug] purchaser are . . . categorized . . . as verbal parts of acts . . . [that] are not considered to be assertions and do not fall under the scrutiny of the Rules Against Hearsay." *Id.* (citation omitted).

¶ 23    Like similar offers or solicitations, the text messages were not admitted here for the truth of the matter being asserted in them

(whether Dominguez could do "2 for 1500" or "2 for 1600") or the truth of their arguably implied assertion (that Dominguez was someone who could provide "2 for 1500" or "2 for 1600"), but for the fact that a request to purchase something at a proposed price was made, which is not hearsay. *Id.* at 697, 704 (concluding that an unidentified caller's out-of-court statement asking, "[C]an I get a 40?" (a request to purchase cocaine) was admissible as a verbal act); *see Rodriguez-Lopez*, 565 F.3d at 315 (noting that evidence of "ten successive solicitations for heroin" received by the defendant was not offered "for [its] truth, but as evidence of the fact that [the solicitations] were made"); *cf. State v. Chavez*, 239 P.3d 761, 762-63 (Ariz. Ct. App. 2010) (holding that text messages seeking to purchase drugs ("Can you deliver a 'T' to the house?") were admissible because they were not offered to prove the truth of the matter asserted); *State v. Connally*, 899 P.2d 406, 408-10 (Haw. 1995) (concluding that statements that the defendant would perform sex acts for money were "verbal acts" and not offered to prove the truth of the matter asserted).

¶ 24     We therefore conclude that the trial court did not err in finding the text messages were not assertions under CRE 801 and thus admissible.

## C.     Due Process

¶ 25     Dominguez alternatively contends that "[i]f CRE 801 aligns Colorado with the federal intent-based approach, then . . . the rule, as applied, violates his due process rights."  This is so, he continues, because, under federal law, the burden is on the party claiming an intended assertion to show that intent, which, according to Dominguez, is fundamentally unfair and amounts to burden shifting.

¶ 26     Dominguez did not make this argument to the trial court and it is thus unpreserved.  *See Reyna-Abarca v. People*, 2017 CO 15, ¶ 47.  But because we do not rely on the intent-based approach in concluding that the trial court did not err in admitting the text messages, we need not consider Dominguez's due process contention.

## D.     CRE 403

¶ 27     Dominguez also contends that the trial court's admission of the text messages violated CRE 403.  More specifically, he argues

the prejudice from the text messages substantially outweighed their probative value because the probative value depended on speculative assumptions which served to prejudice, confuse, or mislead the jury.  We disagree.

¶ 28     Dominguez did not object to the admission of the text messages under CRE 403.  We thus review for plain error.  *People v. Allgier*, 2018 COA 122, ¶ 30.  We will not reverse under this standard unless the error was obvious and so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.  *Id.*; *accord Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 29     CRE 403 strongly favors the admission of evidence.  *People v. Greenlee*, 200 P.3d 363, 367 (Colo. 2009).  But "[e]ven relevant evidence is excludable if it is 'unfairly' prejudicial . . . ."  *People v. Brown*, 313 P.3d 608, 615 (Colo. App. 2011) (citation omitted).  To be excluded, "the danger of unfair prejudice must substantially outweigh the legitimate probative value of the evidence."  *People v. James*, 117 P.3d 91, 94 (Colo. App. 2004).

¶ 30     In reviewing the disputed evidence, we "must afford [it] the maximum probative value attributable by a reasonable fact finder

and the minimum unfair prejudice to be reasonably expected." *People v. Gibbens,* 905 P.2d 604, 607 (Colo. 1995). Evidence is not unfairly prejudicial "simply because it damages the defendant's case" but, instead, must have an "undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." *People v. Dist. Court,* 785 P.2d 141, 147 (Colo. 1990).

¶ 31 Nothing in the text messages here was inflammatory or incited the jury to render a verdict on an improper basis. The text messages plainly suggest an offer to purchase "2 for 1500" or "2 for 1600," and giving these messages their maximum probative value, such a solicitation was relevant to the charged crimes. While the texts may have hurt Dominguez's defense, we don't agree that they were unfairly prejudicial.

¶ 32 We are unpersuaded by Dominguez's contention that *People v. Franklin,* 782 P.2d 1202 (Colo. App. 1989), requires a different result. In *Franklin,* a prosecution witness testified that "just before the [charged] shooting, he tried to follow the victim out the front door but was prevented from doing so by an 'unnamed man' who had been seen talking to defendant," and this man "told the

13

witness, 'Now is not a good time to go out,' then counted off three shots as they were fired." *Id.* at 1204. Given that the probative value of these statements "follows only if a number of speculative assumptions about the statements [were] made," the division held that "they could only have served to prejudice, confuse, or mislead the jury," and concluded that they were inadmissible under CRE 403. *Id.* at 1206.

¶ 33     Unlike the statements in *Franklin*, we don't agree that the text messages, sent directly to Dominguez's cell phone, required "a number of speculative assumptions" that rendered them unfairly prejudicial under CRE 403. Thus, we perceive no error, let alone plain error, in the admission of the text messages.

### III.     Lay Witness Testimony

¶ 34     Agents Carmichael and Alderete testified at trial. The prosecution didn't qualify either as an expert witness. Dominguez contends that the trial court erred in allowing them to offer expert testimony under the guise of lay testimony. We see no reversible error.

## A. Additional Facts

¶ 35    The prosecutor asked Agent Carmichael why he had taken the electronic scale from Dominguez's truck. Dominguez's counsel objected, arguing that the question "calls for an expert opinion." The court overruled the objection, and Agent Carmichael testified, "[f]rom [his] training and experience, [he] kn[e]w that electronic scales are often used to weigh drugs in order to distribute drugs. You can see on this scale that there is a white substance on the scale. This is consistent with a scale used for drug distribution."

¶ 36    Later, the prosecutor asked Agent Alderete about the "significance" of the text messages "2 for 1500" and "2 for 1600" found on Dominguez's cell phone. Dominguez's counsel objected "to that as expert testimony." In response, the court instructed the prosecutor to "[l]ay further foundation." After discussing Agent Alderete's police training and experience with the West Metro Drug Task Force, the prosecutor again asked, "so based on your training and experience, . . . what, if any, significance did [these] [text] message[s] have to you?"

¶ 37    Over Dominguez's counsel's renewed objection, Agent Alderete testified,

> So in speaking about methamphetamine, . . . it would lead [him] to believe . . . that this person is asking for 2 ounces of methamphetamine. An ounce of methamphetamine runs, on the low end, . . . about $500; on the high end, you might pay a thousand, 1100. So this fits right in that range of a couple of ounces of methamphetamine.

¶ 38 Agent Alderete later testified, without objection, that over an ounce of methamphetamine was "[n]ot typically . . . what we see" for personal use. And, regarding requests for the purchase of methamphetamine, he testified, again without objection, "[t]ypically if you have a customer you deal with all the time and you start talking numbers, it's known. It's very rare for somebody to say methamphetamine, cocaine, heroin. There's always code words. Most of the time there's code words that are sent."

### B.    Standard of Review and Applicable Law

¶ 39 A lay witness may testify "in the form of . . . opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." CRE 701. But when a witness's testimony requires scientific, technical, or

specialized knowledge, the witness must be qualified as an expert by virtue of his "knowledge, skill, experience, training, or education." CRE 702.

¶ 40 To determine whether a witness's testimony constitutes a lay opinion under CRE 701 or an expert opinion under CRE 702, we look to "the basis for the witness's opinion." *Venalonzo v. People*, 2017 CO 9, ¶ 22. If the testimony is expected "to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony." *Id.* at ¶ 23. But when the witness's testimony "could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony." *Id.*

¶ 41 We review a trial court's rulings admitting witness testimony for an abuse of discretion. *People v. Bryant,* 2018 COA 53, ¶ 55.

### C. Discussion

¶ 42 Given that Agent Carmichael's opinion on the electronic scale was expressly based on his "training and experience," we agree that this was an expert opinion. *See People v. Stewart,* 55 P.3d 107, 124 (Colo. 2002) (holding that where "an officer's testimony is based not only on her perceptions and observations of the crime scene, but

also on her specialized training or education, she must be properly qualified as an expert before offering testimony that amounts to expert testimony"); *see also People v. Kubuugu*, 2019 CO 9, ¶ 14 (concluding that a police officer's opinion testimony based on "his training and experience" constituted expert testimony).

¶ 43     Agent Alderete's opinions regarding the price range for methamphetamine, the amount of methamphetamine for personal use, and use of code words when purchasing methamphetamine, offered after he testified at length regarding his training and experience with the drug task force, were also improper expert opinions. *See Kubuugu*, ¶ 14; *Stewart*, 55 P.3d at 124; *see also Bryant*, ¶ 64 ("A hallmark of expert testimony by law enforcement officers is that an officer testifies as to his extensive experience in the field."); *People v. Veren*, 140 P.3d 131, 138-39 (Colo. App. 2005) (concluding that the police officers's testimony that "possession of a large amount of nonprescription pseudoephedrine is indicative of a person's intent" to manufacture methamphetamine was expert testimony).

¶ 44     We aren't persuaded otherwise by the People's contention that Agents Carmichael's and Alderete's opinions were within an

ordinary person's knowledge because of news coverage and mainstream entertainment (including fictional television shows) that have discussed or dramatized drug distribution. While such topics may be generally more prevalent in our society, we can't agree that Agents Carmichael's and Alderete's opinions, admittedly based on their specialized police training and experience, encompass an ordinary person's experiences or knowledge.

¶ 45    Because the agents gave expert testimony under the guise of lay testimony, we conclude the trial court abused its discretion in admitting it.  *See Kubuugu*, ¶ 14; *Stewart*, 55 P.3d at 124.

¶ 46    Reversal, however, is required only if the improper expert testimony substantially influenced the verdict or affected the fairness of the proceedings.[3]  *Hagos*, ¶ 12; *Stewart*, 55 P.3d at 124. "[T]he strength of the properly admitted evidence supporting the guilty verdict is clearly an 'important consideration' in the harmless

---

[3] We recognize that Dominguez did not object to Agent Alderete's testimony on personal use and code words and that the People dispute Dominguez's preservation of his objection to Agent Carmichael's testimony.  But because we conclude that the admission of these improper statements was harmless, we need not determine this preservation issue or conduct a separate plain error analysis.

error analysis." *Pernell v. People*, 2018 CO 13, ¶ 25 (citation omitted). So, when the evidence overwhelmingly shows guilt, an error is generally harmless. *Id.* That occurred here.

¶ 47    Dominguez defended against the possession of a controlled substance with intent to distribute count on the theory that he had no intent to distribute the methamphetamine.[4] But overwhelming evidence showed otherwise.

¶ 48    Dominguez possessed a bag with nearly half a pound of methamphetamine, small bags containing less than one gram of methamphetamine, a small spoon "that appeared . . . to be the size used to fill these smaller baggies," and an electronic scale with a white substance on it. As well, the properly admitted text messages circumstantially supported the inference that Dominguez distributed drugs.

¶ 49    Of even greater consequence, Dominguez's own statements demonstrated an intent to distribute methamphetamine. First, following his arrest, Dominguez admitted to a police agent that the

---

[4] At trial, Dominguez conceded guilt on the possession of drug paraphernalia, vehicular eluding, reckless driving, and driving under restraint counts. And he does not contend that the improper expert testimony requires the reversal of these convictions.

methamphetamine "cost him $4,000" but that "a bag that size would cost $6,800 on the street." This testimony also rendered Agent Alderete's testimony on the price range for methamphetamine cumulative, as Dominguez's estimate equates to $850 per ounce, which is in the price range described by Agent Alderete. *See Bryant*, ¶ 77 (finding the admission of improper expert testimony harmless where it was cumulative of other evidence admitted at trial).

¶ 50    Second, in a recorded jail call, Dominguez told an unidentified female that he (1) was going to give her "some information that's gonna be useful"; (2) had "$11,000 out there"; (3) had put "all the numbers together and it [came] out to $11,000 not including what they found in the truck"; (4) was going to send her a "list" that showed how to "get ahold of everybody"; and (5) had received a text message from "Cash" before his arrest saying that he needed Dominguez to come over because he had "someone who was looking."

¶ 51    Given all this evidence, we can't agree with Dominguez that the agents's limited testimony about the electronic scale, price range for methamphetamine, drug quantities for personal use, and

21

the use of code words substantially influenced the verdict or affected the fairness of the trial. *See Stewart*, 55 P.3d at 124-25 (holding improper admission of police officers's expert testimony harmless given the overwhelming evidence of guilt); *see also People v. Froehler*, 2015 COA 102, ¶ 42; *cf. Kubuugu*, ¶ 16 (concluding that improperly admitted expert testimony was not harmless error when that testimony "was the only evidence that specifically refuted" the defendant's exculpatory testimony).

¶ 52    We therefore conclude that Agents Carmichael's and Alderete's improperly admitted expert testimony was harmless.

## IV.    Prosecutorial Misconduct

¶ 53    Dominguez next contends the prosecutor committed reversible misconduct in rebuttal closing argument. We are not persuaded.

¶ 54    The court correctly instructed the jury before closing argument that

> reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

¶ 55    During rebuttal closing argument, the prosecutor made the

following comment on this instruction:

>   Whether it's such a doubt as would cause
>   reasonable people to hesitate to act in matters
>   of importance to themselves, and you can each
>   individually think, what would be a matter of
>   importance to myself, maybe a major life
>   decision, maybe a major purchase.  Whatever
>   it is that would be a matter of importance to
>   yourself, would you hesitate.
>
>   Well, of course you would.  Nobody makes
>   snap decisions about something that's
>   important to them or important decisions. . . .
>   *Do you not act, because if it's that kind of a
>   doubt, that's a reasonable doubt.*

(Emphasis added.)

¶ 56    Dominguez contends this comment "redefin[ed] 'reasonable

doubt'" and warrants reversal.  Because his attorney did not object

to the comment, we review for plain error.  *See People v. Ujaama*,

2012 COA 36, ¶ 37.  To be plain, the error must be (1) obvious and

(2) so grave that it casts serious doubt on the reliability of the

judgment of conviction.  *Id.* at ¶ 43.

¶ 57    Even if we assume (without deciding) that the prosecutor

misstated the law on reasonable doubt, *see People v. Van Meter*,

2018 COA 13, ¶ 31, we conclude reversal is not warranted for two reasons.

¶ 58     First, the prosecutor's reasonable doubt comment occurred only once during rebuttal closing argument, and it was not repeated.  *See People v. Carter*, 2015 COA 24M-2, ¶ 60 (finding no plain error in prosecutor's brief improper comment on reasonable doubt standard); *see also People v. Grant*, 174 P.3d 798, 811 (Colo. App. 2007) (concluding that the prosecutor's one brief misstatement of the law in closing argument did not constitute plain error).

¶ 59     Second, the trial court correctly instructed the jury orally and in writing on reasonable doubt, "neutraliz[ing]" the prosecutor's improper comment.  *People v. Santana*, 255 P.3d 1126, 1136 (Colo. 2011).  And before making the rebuttal comment, the prosecutor referred to this instruction.  Absent record evidence to the contrary, we presume that the jury followed the court's instruction.  *See Van Meter*, ¶ 33; *Carter*, ¶ 59.

¶ 60     For these reasons, we see no plain error in the prosecutor's single reasonable doubt comment.

## V.  Merger

¶ 61    Last, Dominguez contends that, as a lesser included offense, his reckless driving conviction must merge with his vehicular eluding conviction.  Under the circumstances here, we don't agree.

¶ 62    Dominguez didn't preserve this issue, so we review for plain error.  *Reyna-Abarca*, ¶ 47.

¶ 63    The Double Jeopardy Clauses of the United States and Colorado Constitutions protect a defendant from suffering multiple punishments for the same offense.  U.S. Const. amend. V; Colo. Const. art. II, § 18; *Reyna-Abarca*, ¶ 49.  A defendant, therefore, may not be convicted of a lesser included offense when "the elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense." *Reyna-Abarca*, ¶ 64; *see also Jackson*, ¶ 73.  But "[m]ultiple convictions for two separate offenses the elements of one of which constitute a subset of the elements of the other can clearly stand if the offenses were committed by distinctly different conduct." *People v. Rock*, 2017 CO 84, ¶ 17; *accord Jackson*, ¶ 73.

¶ 64     "A person who drives a motor vehicle . . . in such a manner as to indicate either a wanton or a willful disregard for the safety of persons or property is guilty of reckless driving." § 42-4-1401(1), C.R.S. 2018. "[R]eckless driving is a lesser included offense of vehicular eluding." *People v. Esparza-Treto*, 282 P.3d 471, 478 (Colo. App. 2011); *see also* § 18-9-116.5(1), C.R.S. 2018 (elements of vehicular eluding).

¶ 65     But, here, the undisputed evidence shows that, though not separately charged, Dominguez committed two separate and temporally distinct instances of reckless driving. *Cf. Rock*, ¶ 17 ("Separate convictions for even the same offense are permissible if it was committed more than once."); *Jackson*, ¶ 82 (recognizing that, to determine whether separate offenses were committed, "we examine whether the conduct occurred at different locations, was the product of new volitional departures, was separated by time, or was separated by intervening events").

¶ 66     In opening statements, Dominguez's counsel told the jury that at the house of Dominguez's daughter's grandmother, "Dominguez sped off driving recklessly without his license and got into the chase with the police."

26

¶ 67    Consistent with Dominguez's attorney's opening statement, the prosecution presented evidence of two distinct reckless driving incidents.  First, testimony about Dominguez leaving the home of his daughter's grandmother established the following:

- Dominguez "took off at a very high rate of speed, and he didn't stop.  There's a stop sign at the bottom of [the] hill, and he hit the dip[s] . . . and everything just came flying out of the truck and landed back down."

- Dominguez "sped off . . . and when he did that, he hit the dip of a hill . . . and nearly flipped the truck."

- He was driving "[r]ecklessly and fast."

- "He placed the vehicle in drive[,] floored it[,] took off, and hit the dip at the bottom of . . . the hill and almost rolled the truck there.  The truck went on two wheels spun around, fishtailed for a while and then he straightened it out and continued on."

¶ 68    Second, Agent Garza testified that she later saw Dominguez's truck pull up beside her and that she followed the truck for a short time in traffic before attempting a traffic stop.  She stated only at that point did Dominguez "accelerate" and "pull[] away from" her.

27

She described Dominguez driving fifteen to almost forty miles per hour over the speed limit, weaving around other cars, and driving in the median.

¶ 69    With respect to the two incidents, in closing argument Dominguez's counsel told the jury, "you heard the evidence, he peeled away from the house" and after the agents activated their sirens, he "led them on a high-speed chase."

¶ 70    Thus, the jury heard evidence (not disputed by Dominguez) that he recklessly drove away from his daughter's grandmother's house and then, at some later point and in a different location, recklessly led the police on a high-speed chase.  Given the break in time and space between these two reckless driving incidents, the undisputed evidence supported "distinctly different conduct" between the reckless driving and vehicular eluding convictions.

¶ 71    We therefore can't conclude that the trial court plainly erred in not sua sponte merging these convictions.  *See Rock*, ¶ 17; *cf. People v. Gingles*, 2014 COA 163, ¶ 42 (concluding that because the evidence supported two separate convictions, there was no double jeopardy violation).

## VI.  Conclusion

¶ 72   We affirm the judgment of conviction and sentence.

JUDGE MÁRQUEZ and JUDGE MILLER concur.