The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 7, 2022

## 2022COA71

**No. 19CA1364, *People v. Archer* — Crimes — Child Abuse
Resulting in Death**

A division of the court of appeals holds that a defendant's

conviction for child abuse resulting in death is supported by

sufficient evidence despite the fact that he himself did not

physically mistreat the victims.

COLORADO COURT OF APPEALS **2022COA71**

Court of Appeals No. 19CA1364
San Miguel County District Court No. 17CR28
Honorable Keri A. Yoder, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ashford Nathaniel Archer,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE GROVE
Yun and Taubman*, JJ., concur

Announced July 7, 2022

Philip J. Weiser, Attorney General, Erin K. Grundy, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Suzan Trinh Almony, Alternate Defense Counsel, Broomfield, Colorado, for
Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2021.

¶ 1     Defendant, Ashford Nathaniel Archer, appeals his convictions for two counts of child abuse resulting in death and one count of accessory to a crime.  Although Archer himself did not physically mistreat the victims, we conclude that his active participation in the decision-making process that led to their deaths was sufficient to support his convictions.  We therefore affirm.

## I.     Background

¶ 2     At trial, the People presented evidence from which the jury could find the following facts.  Archer was part of an itinerant religious group that, in the summer of 2017, met Alec Blair by chance at a gas station east of Grand Junction.  Blair owned twenty acres of land near Norwood where he was attempting to grow vegetables and marijuana.  The land was undeveloped and had no electricity, plumbing, power, or water rights, but, after getting to know some of the members of the group during their chance meeting, Blair invited them to stay there.

¶ 3     When Archer and the others met Blair, their group was made up of of five adults and four children traveling in two vehicles.  Codefendant Madani Ceus was the group's spiritual leader; she and Archer were the biological parents of two of the children.  The other

1

two children — the victims, who were approximately ten and eight years old — were the daughters of codefendant Nashika Bramble, another member.

¶ 4        Blair's property had no permanent structures, so when the group arrived, they set up camp in tents, shacks, and their cars. Their spiritual beliefs were complex, but, as relevant here, they claimed to be "metaphysical healers" and sought spiritual purity by observing strict dietary rules and limiting personal possessions. Adhering rigorously to the group's rules was the only way that followers could acquire "light bodies" that would be able to enter heaven after the coming "purge."

¶ 5        Although Ceus was the group's spiritual head, she did not make decisions on her own.  Rather, according to Blair, a three-person "hierarchy" including Ceus and Archer[1] "collectively as a unit ma[de] decisions for things."

_____

[1] The third member of the leadership trio was initially Cory Sutherland, but Blair explained that his behavior became "extremely erratic" and that he was expelled from the group.  Blair then took his place.

2

¶ 6     The victims died after they were banished to a vehicle in an isolated part of the property to work on their spiritual development. Ceus declared that the victims were no longer allowed to eat the food that she cooked, so on one occasion Blair and others gave them food that they had collected at a local food bank. But then Ceus barred anyone from leaving the property to obtain provisions, and no one gave the victims food, water, or other assistance again. They died some time later and, a month after that, Archer and Blair covered the car with a tarp to hide the bodies from law enforcement officers coming to the farm for periodic marijuana compliance checks.

¶ 7     By the time the authorities learned what had happened and conducted an investigation, the victims' bodies were so badly decomposed that the medical examiner was unable to determine the cause of death. But the medical examiner testified that they likely died from starvation, dehydration, hyperthermia, or some combination of these factors. In addition, scientific evidence suggested that they had been periodically undernourished in the last fifteen months of their lives.

¶ 8     The police learned of the girls' deaths from Blair's father, who had come to the farm from Texas to check on his son's well-being. When contacted by police, Archer said that the victims had been placed in the car as punishment.

## II.    Analysis

¶ 9     On appeal, Archer contends that (1) the evidence presented at trial was insufficient to sustain his convictions for child abuse resulting in death; (2) the trial court erroneously admitted unreliable scientific evidence; and (3) the trial court reversibly erred by admitting certain hearsay statements made by Ceus.  We address each issue in turn.

### A.    Sufficiency of the Evidence

¶ 10     We first conclude that because the prosecution presented sufficient evidence to support the jury's verdict on the two charges of child abuse resulting in death, the trial court properly denied Archer's motion for judgment of acquittal.

#### 1.    Standard of Review

¶ 11     When a defendant challenges the sufficiency of the evidence, we review the record de novo to determine whether the evidence, viewed in the light most favorable to the prosecution, is substantial

and sufficient to support the conviction beyond a reasonable doubt. *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). In doing so, we do not act as a thirteenth juror; whether we would have found the defendant guilty beyond a reasonable doubt based on the evidence presented is irrelevant. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). Instead, the pertinent question for us is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *Id.*

### 2. Act or Omission

¶ 12 Under section 18-6-401(1)(a), C.R.S. 2021, a person commits child abuse if he

> causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

¶ 13 Archer contends that he did not engage in conduct prohibited by this statute, and thus cannot stand convicted of child abuse

resulting in death, because he (1) did not take any actions that injured the victims, and (2) had no special relationship with the victims that required him to take any action to save them from the neglect that he claims was the fault of their mother and others on the property. We disagree with both arguments.

¶ 14     First, although the parties dispute whether Archer was required under section 18-6-401(1)(a) to intervene on the victims' behalf despite the fact that he was not their biological father, the prosecution presented substantial evidence that Archer did not simply fail to intervene; to the contrary, he engaged in affirmative acts of mistreatment, thereby rendering irrelevant the question of his relationship with the victims. For example, as we have already discussed, there was evidence at trial that, as a member of the group's inner circle, Archer regularly participated in council meetings in which he, along with the other members, "collectively as a unit ma[de] decisions for things." And although the girls' banishment and deprivation may have been pronounced by Ceus, there was ample evidence that it resulted from a collective decision in which Archer participated. For example, Blair testified that Archer participated in conversations about the two girls during

6

council meetings, and that Archer had not revealed to him that there were four children with the group, rather than three, until they had been on the property for nearly two months. When he overheard a conversation about a fourth child, Blair asked Ceus and Archer about that child because no one had ever mentioned her to him and he had not seen her around the property. After they "stepped aside and conferred," Archer "brought [Blair] over to the gray sedan[,] . . . opened up the door of the vehicle[,] and showed [Blair] that there were two children inside of the vehicle, one of [whom Blair] had never seen before." This testimony supports an inference that the younger child had been confined to the vehicle for many weeks, during the summer, with Archer's full knowledge and participation, even before the group began to deprive her and her sister of food and water.

¶ 15 Moreover, Archer's actions led to Ceus's decree that the girls should be abandoned in the car. For example, after Archer siphoned gas from the car, Ceus declared that he had "gray energy," and then "cleansed him by performing a blessing," but then "essentially ordered [the members of the group]" to stay away from the car. Someone drew a "physical perimeter" around the vehicle

7

that no one was allowed to enter, and the group then moved to another part of the property, leaving the victims to die.

¶ 16     Second, even if Archer had not affirmatively contributed to the conditions that led to the girls' deaths, and even if section 18-6-401(1)(a) does not broadly impose a duty to rescue,[2] there was ample evidence at trial showing that he was far more than an innocent bystander.  Indeed, he admitted to the investigating police officer that the girls had been placed in the car as punishment, and he was a leader of a nine-member group that had traveled around the country in two vehicles for years, moved to the Blair property together, and referred to itself as a "family" as it proselytized and attempted to recruit new followers like Blair.  Under these circumstances, whether Archer had a formal familial relationship with the victims is beside the point.  He was responsible, along with

---

[2] At least one division of this court has held that the statute *does* impose such a duty.  *See People v. Arevalo*, 725 P.2d 41, 48 (Colo. App. 1986) ("The statute refers to no external source of duty, and we do not believe the general assembly intended that a duty between an adult and a child [must] necessarily be established before a person may be charged with child abuse.  The law is intended to prevent child abuse, and it applies to any person.").

all the other adults, for the well-being of those children who were in the group's care.

### 3. Knowing or Reckless

¶ 17    The prosecution also presented sufficient evidence to establish that Archer's actions were knowing or reckless.

¶ 18    As relevant here, child abuse requires that the defendant knowingly or recklessly causes serious bodily injury to a child. § 18-6-401(1)(a), (7)(a)(III). For most offenses, "knowingly" means that the defendant is aware that his or her conduct is practically certain to cause a particular result. § 18-1-501(6), C.R.S. 2021. And "recklessly" means that the defendant consciously disregards an unjustifiable risk that a result will occur or a circumstance exists. § 18-1-501(8). In other words, for most offenses, the mental states of knowingly and recklessly relate to the result of the conduct (often an injury to the victim).

¶ 19    But child abuse is different. For this offense, the culpable mental states relate "to the nature of the offender's conduct in relation to the child or to the circumstances under which the act or omission occurred," not a particular injury to the child. *People v. Deskins*, 927 P.2d 368, 371 (Colo. 1996). Thus, "knowing" child

9

abuse does not require that the defendant is aware that his conduct will cause serious bodily injury. Instead, to knowingly commit child abuse, a defendant need only be aware of the conduct he is engaging in with the child. Similarly, to recklessly commit child abuse, a defendant need only consciously disregard a substantial and unjustifiable risk that, given the child's circumstances, the child may be injured. *Id.*

¶ 20 There was sufficient evidence that Archer acted knowingly or recklessly because, even though he was aware that the victims were confined to a car during the summer and then abandoned there without food or water, he did nothing to help them, and in fact he consciously disregarded the substantial risk that they would die as a result of being abandoned. Accordingly, the evidence presented at trial was sufficient to support Archer's convictions for child abuse resulting in death.

## B. Expert Testimony

¶ 21 Archer contends that the trial court abused its discretion by admitting, and then declining to strike, expert scientific testimony on hair follicle analysis. We are not persuaded.

### 1. Standard of Review

¶ 22    "Trial courts are vested with broad discretion to determine the admissibility of expert testimony, and the exercise of that discretion will not be overturned unless manifestly erroneous." *People v. Wallin*, 167 P.3d 183, 187 (Colo. App. 2007) (citing *People v. Martinez*, 74 P.3d 316, 322 (Colo. 2003)). "An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law." *People v. Payne*, 2019 COA 167, ¶ 5.

¶ 23    "In assessing whether a trial court's decision is manifestly unreasonable, arbitrary, or unfair, we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within the range of reasonable options." *Hall v. Moreno*, 2012 CO 14, ¶ 54 (quoting *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230-31 (Colo. App. 2006)).

### 2. The Testimony was Properly Admitted

¶ 24    CRE 702 is a liberal rule that favors admissibility of scientific evidence if it is reliable and relevant. *See People v. Shreck*, 22 P.3d 68, 77, 79 (Colo. 2001). To determine the admissibility of scientific evidence under CRE 702, the trial court must analyze whether (1)

the scientific principles underlying the expert's testimony are reliable; (2) the expert is qualified to give an opinion on the subject; (3) the testimony will be helpful to the jury; and (4) the probative value of the testimony is substantially outweighed by the danger of unfair prejudice. *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011); *Shreck*, 22 P.3d at 77.

¶ 25    "A trial court's reliability inquiry under CRE 702 should be broad in nature and consider the totality of the circumstances of each specific case." *Shreck*, 22 P.3d at 77; *accord People v. Ramirez*, 155 P.3d 371, 378 (Colo. 2007).  In conducting this inquiry, a trial court may consider a wide range of factors pertinent to the case, including (1) whether the technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the existence and maintenance of standards controlling the technique's operation; (4) the frequency and type of error generated by the technique; and (5) whether such evidence has been offered in previous cases to support or dispute the merits of a particular scientific procedure. *Shreck*, 22 P.3d at 77-78; *see also People v. Laurent*, 194 P.3d 1053, 1058 (Colo. App. 2008).

¶ 26    Before trial, the prosecution endorsed as experts two chemists employed by IsoForensics, Inc., who had conducted isotope chemical analysis on the victims' hair in an effort to determine what had caused their deaths.  In essence, the prosecution's goal in presenting this testimony was to establish that the children had died due to starvation — a showing that, according to the IsoForensics experts, could be made by conducting a stable isotope analysis on hair samples taken from the victims and comparing the ratios of carbon and nitrogen isotopes to typical baseline figures.

¶ 27    Archer's attorney objected to the endorsement of the IsoForensics experts, but the court ruled that the testimony would be admitted after holding a two-day *Shreck* hearing.  It found that the scientific principles underlying the stable isotope analysis were reasonably reliable and that the "testing methods for isotopes are well-established and each step of the technique has been documented in peer-reviewed literature."  The court also found that the evidence would be helpful to the jury because "[t]he victims' causes of death are in dispute."

¶ 28    At trial, one of the IsoForensics experts surprised the prosecution by expressing concerns about potential contamination

of one of the two samples, and as a result the trial court excluded that sample. After the IsoForensics testimony was complete, the prosecutor followed up with the witness to assess the source of his concerns. The witness emailed the prosecutor regarding his doubts about the excluded sample. The prosecutor then disclosed that email to the defense, which raised the issue with the court the next day.

¶ 29    The court noted that the sample it had excluded was the only one that was possibly contaminated and that "[t]here was no testimony received about the test results that did come in that were cause for concern." Nonetheless, because there were questions about the integrity of the IsoForensics data, the court ordered that the IsoForensics experts return for a follow-up in camera hearing on the issues that had been raised. After that hearing, the court reaffirmed its ruling that "the People did not lay proper foundation to admit the [excluded] sample." But the court also found that it had not "heard anything that[] changed [its] mind about the reliability of the first sample" and ruled that it was "properly before the jury."

14

¶ 30    We conclude that the court's ruling was well within its broad

discretion.  When concerns about the general integrity of the

IsoForensics data and analysis arose, the court went to great

lengths to determine whether those concerns undermined its initial

ruling that the testimony was reliable and generally admissible

under CRE 702.  The court's determination that its initial reliability

findings were not undermined by the additional testimony has

substantial record support, and, thus, we will not disturb it.

¶ 31    We reach the same conclusion with respect to Archer's

argument that the court should have excluded the IsoForensics

experts' testimony under CRE 403.  Archer asserts that "the

IsoForensics evidence was unfairly prejudicial because it was

unreliable," but as we have already held, the trial court's reliability

determination was not an abuse of its broad discretion.

### C.    Co-Conspirator Statements

¶ 32    Last, Archer contends that the trial court erroneously relied on

CRE 801(d)(2)(E) to admit out-of-court statements made by Ceus,

who the prosecution argued was Archer's co-conspirator in the deaths of the two victims.[3]  We disagree.

### 1. Standard of Review and Preservation

¶ 33  As with other evidentiary rulings, we review the court's admission of statements under CRE 801(d)(2)(E) for an abuse of discretion.  *People v. Faussett,* 2016 COA 94M, ¶ 33.  In determining whether the court abused its discretion, however, we not only consider whether the court's ruling was manifestly arbitrary, unreasonable, or unfair, but also whether the court correctly applied the law when making its evidentiary ruling.  *People v. Dominguez,* 2019 COA 78, ¶ 13.  We review the latter issue de novo.  *Id.*

¶ 34  The parties agree that this issue is preserved for our review.

---

[3] To the extent that Archer contends that the admission of Ceus's statements under CRE 801(d)(2)(E) amounted to a violation of his confrontation rights under the United States and Colorado Constitutions, we decline to consider the issue because it is not developed in the opening brief.  *See People v. Wallin,* 167 P.3d 183, 187 (Colo. App. 2007) (declining to address arguments presented in a perfunctory or conclusory manner).

### 2. Legal Principles

¶ 35　CRE 801(d)(2)(E) authorizes admission of a "statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." These statements are considered an admission of a party-opponent and therefore do not fall within the definition of hearsay. *People v. Montoya*, 753 P.2d 729, 732 n.2 (Colo. 1988).

¶ 36　However, as a prerequisite to admitting these statements, the trial court must find by a preponderance of the evidence that a conspiracy existed and that the statement was made in furtherance of the conspiracy. *Montoya*, 753 P.2d at 734; *see* CRE 801(d)(2)(E). In determining whether a conspiracy existed, the trial court may consider the co-conspirator's statements themselves, "but there must also be some independent evidence establishing that the defendant and the declarant were members of the conspiracy." *Villano*, 181 P.3d at 1229; *see Montoya*, 753 P.2d at 736.

### 3. Admissibility of Ceus's Statements

¶ 37　Archer challenges the admission of three statements made by Ceus that the trial court admitted under CRE 801(d)(2)(E):

- The older victim was impure because she was not working on her past life.[4]

- The older victim could not drink water collected from a waterfall during a group outing.

- Neither victim could be fed from the group's special food supply.

¶ 38    The prosecutor made an extensive offer of proof in support of the admission of these statements. The conspiracy was, as he described it, "to put these girls in a car, to not give them any food and water, to put a perimeter around the car so that no one would come in contact with the car, to go down to the north end of the property and meditate and hold council for 24 hours a day, ignoring the girls, and then the girls ultimately dying in that car."

---

[4] When making his offer of proof under CRE 801(d)(2)(E), the prosecutor described this statement as follows: "That she was not pure; that Mr. Blair told them about a dream he had where [the older victim] was sitting with an alligator, and the group started talking extensively about this and told him that she doesn't work on her past lives and has lots of setbacks and problems." In his opening brief, Archer mentions only that portion of the statement shown in the first bullet point above.

¶ 39    The court ruled that the statements in question were admissible under CRE 801(d)(2)(E), saying that,

> [b]ased on the totality of the circumstances, including all of those statements, including the religion that they practiced, including the fact that Mr. Archer followed Ms. Ceus, including the fact that a lot of these statements were – some of them at least were made in his presence, I do find by a preponderance of the evidence that there was a conspiracy at least to . . . banish the girls.  I can't find that there was a conspiracy to kill the girls or something, but that there was a conspiracy or an agreement at least to banish the girls or not include them in group activities.

¶ 40    The finding of a conspiracy, however, was not the only basis for the court's ruling.  With respect to the first two statements identified above, the court also found that they were adoptive admissions by Archer and thus admissible under CRE 801(d)(2)(B).  And, as for the third statement, the court found that it was "a non-hearsay directive" (that is, it was not offered for the truth of the matter asserted in the statement), and thus "would not be hearsay in any event if [Ceus] made that assertion."

¶ 41    We find no abuse of discretion in the court's ruling under CRE 801(d)(2)(E).  As we have already discussed, evidence at trial (and the prosecutor's offer of proof) showed that Archer was a core

19

member of the religious group and participated in the council's decision-making process, and the existence of the conspiracy was corroborated by, among other things, Blair's testimony, the physical evidence at the scene, and Archer's admission to the investigating officer that the victims had been placed in the car as punishment. Given these facts, the prosecutor's offer of proof was more than sufficient to support the court's findings under a preponderance of the evidence standard.

¶ 42 In any event, even if the court's rulings were incorrect under CRE 801(d)(2)(E), Archer does not challenge the court's alternative grounds for admitting each of these statements. We would therefore be required to conclude that they were properly admitted regardless of whether the prosecution adequately established that a conspiracy existed. *See IBC Denver II, LLC v. City of Wheat Ridge,* 183 P.3d 714, 717-18 (Colo. App. 2008) (when a trial court gives several reasons for a decision, an appellant must challenge all of those reasons; failure to do so requires affirmance).

## III. Conclusion

¶ 43 We affirm the judgment of conviction.

JUDGE YUN and JUDGE TAUBMAN concur.