The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 16, 2020

**2020COA107**

**No. 17CA0678, *People v. Knapp* — Criminal Law — Sentencing
— Restitution**

Applying the reasoning in *Cowen v. People*, 2018 CO 96, a
division of the court of appeals holds that where a defendant is
charged with one level of offense but is convicted of only a lower-
level offense, an award of restitution for the offense is limited to the
amount consistent with the jury verdict.

In this case, the prosecution charged Mr. Knapp with criminal
mischief as a class 6 felony, but the jury found, through its
interrogatories, that he committed only a class 1 misdemeanor.
Mr. Knapp was also convicted of other several other offenses.

Consistent with *Cowen*, the division holds that the trial court's
award of restitution for the criminal mischief charge was limited by
the jury's answer on its interrogatory.  The division holds, however,

that the trial court could impose restitution for property and nonproperty losses attributable to other offenses for which Mr. Knapp was convicted.

The division also considers and rejects four other arguments raised by Mr. Knapp: (1) that the trial court erred by instructing the jury on the provocation exception to self-defense; (2) that the trial court abused its discretion by admitting evidence that the victim's brother called him a "wife beater"; (3) that the prosecutor improperly questioned him about his post-arrest silence and improperly argued that he had tailored his testimony to the evidence; and (4) that the trial court plainly erred by calculating restitution using the replacement value of several items of property without the necessary foundation.

Court of Appeals No. 17CA0678
Montezuma County District Court No. 16CR88
Honorable Todd Jay Plewe, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joshua Knapp,

Defendant-Appellant.

JUDGMENT AFFIRMED, ORDER REVERSED,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE GOMEZ
J. Jones and Welling, JJ., concur

Announced July 16, 2020

Philip J. Weiser, Attorney General, Gabriel P. Olivares, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Julia Chamberlin, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Joshua Knapp, raises several challenges to his convictions and order of restitution, one of which presents an issue of first impression: whether the rationale in *Cowen v. People*, 2018 CO 96, which precludes a trial court from imposing restitution for acquitted conduct, applies when a jury convicts a defendant of a lesser-level offense than that charged.  We conclude that it does.  Accordingly, although we affirm Mr. Knapp's convictions, we reverse the restitution order and remand the case to the trial court with directions.

## I.     Background

¶ 2     A multi-day argument between Mr. Knapp and the victim, A.J., turned violent and culminated with the filing of multiple domestic violence charges against Mr. Knapp.  At the time, Mr. Knapp and A.J. had been dating on and off for about six years.  During a break in the relationship, A.J. had dated another man.  According to A.J., Mr. Knapp was "constantly obsessed" about her relationship with her ex-boyfriend.

¶ 3     The argument started on a weekend camping trip to Utah.  On Friday evening, A.J. spoke with her sister and brother-in-law on the phone.  During the call, Mr. Knapp overheard A.J.'s brother-in-law

1

refer to him as a "wife beater."[1] Mr. Knapp became upset, both at A.J.'s brother-in-law for making the comment and at A.J. for not defending him to her brother-in-law. He remained agitated about the incident throughout the weekend, even as they returned to A.J.'s house.

¶ 4 According to A.J., that Sunday, Mr. Knapp remained upset and continued "obsessing" about her ex-boyfriend and her brother-in-law. Eventually, he left the house. Later that evening, in a series of texts to A.J., he expressed frustration that she didn't "stick up for the one [she] love[s]" and asked "why would you want to be with me any way fucking woman beater." He also texted, "If you won't stand up for me I'm gonna stand up for myself" and included the brother-in-law's contact information.

¶ 5 When A.J. woke up the next morning, she discovered Mr. Knapp had come back and slept at the house. She took her children to school and returned to find him awake and still agitated,

---

[1] The evidence differed as to whether A.J.'s brother-in-law used the term "woman beater" or "wife beater." We use "wife beater" because that's the terminology the parties used in obtaining a ruling from the trial court on the admissibility of the evidence.

so she left again. While she was out, Mr. Knapp began tracking her location with the "Find My Phone" application on his phone and texting her about her whereabouts. Believing she was lying about where she was, and was actually with her ex-boyfriend, he sent back angry texts calling her derogatory names, warning her that he was watching her (e.g., "I fucking watch you bitch" and "I watched you drive by his work"), and telling her that he was waiting for her at the house. The messages scared her, and she decided to pick her children up from school rather than have them arrive at the house with Mr. Knapp there.

¶ 6     The events that occurred next were hotly disputed at trial. A.J. testified as follows. As she was driving toward the school, she saw Mr. Knapp's truck rapidly approach and bump the back of her truck. She could see from his face that he was "super mad." She continued driving and, after she passed a sheriff's deputy, Mr. Knapp turned and drove away.

¶ 7     A.J. got her children and went to a friend's house. Mr. Knapp continued barraging her with text messages throughout the afternoon, including referencing her friend's name, noting her location when she and her friend went to the store, alternating

3

between telling her he loved her and hated her, and suggesting he was destroying items at her home.  One of his texts also seemed to refer to her brother-in-law's comment, stating, "Will just make all the shit talking true."

¶ 8     That evening, believing from his texts that Mr. Knapp had left the house, A.J. headed home with her children.  She took an alternative driving route to avoid running into Mr. Knapp.  But, as she neared the house, she saw him driving toward her.  He stopped, got out of his truck, punched in her driver's side window, leaned inside, punched her, and bit through her lip.  He warned her she "better get [her] ass home."  Then he jumped into her truck, took her and her daughter's phones, and returned to his truck.

¶ 9     A.J. started driving forward but stopped and got out because glass from the broken window was cutting into her back.  When she did so, Mr. Knapp stopped his truck and ran back toward her.  He grabbed her, threw her against the truck, hit her again, and told her she "better get back home."

¶ 10     A.J. got back in her truck and drove toward her house.  Not seeing Mr. Knapp, she drove past the house and headed to the highway to get away.  But as soon as she got on the highway,

4

Mr. Knapp sped past her. He blocked both lanes in front of her, and she stopped. He then jumped up on the hood of the truck, screamed, banged on the hood, pulled on the windshield wiper, and told A.J. to return home. This time he followed her closely.

¶ 11 When they got to the house, Mr. Knapp continued to assault A.J., including hitting her with the butt of a gun. At one point, he shot off a gun in the house, hitting A.J.'s mattress. Eventually, he fell asleep. A.J. got her children, left the house, and went to another friend's house, where they called the authorities.

¶ 12 A.J.'s thirteen-year-old daughter testified at trial, and her version of events largely tracked A.J.'s.

¶ 13 Mr. Knapp, however, gave a vastly different version of events. His version was as follows. When he believed A.J. was with her ex-boyfriend, he started fighting with her by text and packing his belongings to move out of her house. He didn't leave the house at any point during the day, but stayed there packing and sleeping.

¶ 14 He finally left at dusk and, as he was driving away from the house, he saw A.J. driving toward him. They both stopped. He got out and approached her door to talk to her, but her window was up. He started walking around the front of her truck to get in from the

5

passenger side, at which point she drove into him, forcing him up onto the hood of the truck. He initially held onto the windshield wiper, but when she turned onto the highway, he couldn't hold on and was flung off the truck onto the pavement.

¶ 15    Mr. Knapp headed back to his truck, but A.J. turned her truck around and rejoined him. As she approached, he went to open the driver's side door of her truck to "ask her what the heck she was doing." He also wanted to get her keys so she wouldn't hurt him again or hurt her children. When he grabbed at the door handle and the window (which was at that point halfway down), the window shattered. He reached through the broken window to try to get the keys, but A.J. hit him in the back and head. So he stopped, and only then did he realize A.J.'s nose was bleeding. He went back to his truck, and she drove off in the direction of the house. After a moment, he drove to the house to check on her and the children.

¶ 16    Back at the house, Mr. Knapp resumed gathering his things to leave, but A.J. begged him to stay. They talked for a while, and he eventually fell asleep. He later awoke when law enforcement officers came to the house. He spoke briefly with the officers, but once they arrested him, he invoked his right to remain silent.

¶ 17     The jury convicted Mr. Knapp of some, but not all, of the charged offenses. The convictions included second degree assault, menacing, illegal discharge of a firearm, criminal mischief, third degree assault, reckless endangerment, prohibited use of a weapon, and harassment. The jury found Mr. Knapp had committed most of these offenses (all but the illegal discharge of a firearm and prohibited use of a weapon counts) as acts of domestic violence. The trial court sentenced Mr. Knapp to a term of seven years in the custody of the Department of Corrections and ordered him to pay $13,070.40 in restitution.

## II.     Discussion

¶ 18     Mr. Knapp raises four arguments on appeal: (1) the trial court erred by instructing the jury on the provocation exception to self-defense; (2) the trial court abused its discretion by admitting evidence that A.J.'s brother-in-law called him a "wife beater"; (3) the prosecutor improperly questioned him about his post-arrest silence and improperly argued at closing that he had tailored his testimony to the evidence; and (4) the trial court erred in its findings on restitution. We disagree with the first two arguments, agree in part

with the third but find no plain error, and agree in part with the fourth.

## A. Provocation Instruction

¶ 19    Mr. Knapp contends that the trial court erred by instructing the jury on the provocation exception to self-defense.[2]  We disagree.

¶ 20    A trial court has a duty to instruct the jury correctly on all matters of law for which there is sufficient evidence to support giving instructions.  *Castillo v. People*, 2018 CO 62, ¶ 34.  However, a court shouldn't instruct a jury "on abstract principles of law unrelated to the issues in controversy, nor . . . on doctrines or principles which are based upon fanciful interpretations of the facts unsupported by the record."  *Id.* (quoting *People v. Alexander*, 663 P.2d 1024, 1032 (Colo. 1983)).

¶ 21    We review de novo the question of whether there was sufficient evidence to support a requested instruction.  *Id.* at ¶ 32.  In doing

---

[2] This issue pertains only to the second degree assault charge, as that was the only charge for which the jury was given instructions on, and asked to apply, the affirmative defense of self-defense and the provocation exception to self-defense.

so, we view the evidence in the light most favorable to giving the instruction. *Id.* at ¶¶ 52-53; *People v. Rios*, 2014 COA 90, ¶ 42.

¶ 22    The right to self-defense isn't limitless. For instance, under the plain language of the self-defense statute, a defendant's right to claim self-defense is lost if he or she acted with an intent to provoke the victim into attacking first to provide the defendant with the excuse to injure or kill the victim. *People v. Silva*, 987 P.2d 909, 914 (Colo. App. 1999); *see also* § 18-1-704(3)(a), C.R.S. 2019. This provocation exception to self-defense applies in situations where the defendant wasn't the initial aggressor. *Silva*, 987 P.2d at 914. To be entitled to a provocation instruction, the prosecution bears the burden of establishing that the defendant intended to harm the victim and "to goad the victim into attacking him or her as a pretext for injuring or killing the victim." *Id.*

¶ 23    A provocation instruction should be given if (1) self-defense is an issue in the case; (2) the victim made an initial attack on the defendant; and (3) the defendant's conduct or words were intended to cause the victim to make the attack and provide a pretext for injuring the victim. *Rios*, ¶ 47; *Silva*, 987 P.2d at 914.

¶ 24　　Mr. Knapp challenges only the third element — that is, whether there was sufficient evidence to establish that his conduct or words were intended to cause A.J. to attack him and provide a pretext for injuring her.

¶ 25　　As the parties note, there is some uncertainty about what quantum of proof is required to give an instruction on an exception to an affirmative defense like self-defense. *See, e.g., Castillo,* ¶ 37 n.4; *People v. Galvan,* 2019 COA 68, ¶ 21 (*cert. granted* Jan. 13, 2020). Yet, even applying the more stringent sufficiency of the evidence standard, we conclude that there is sufficient evidence from which a rational jury could find provocation beyond a reasonable doubt. *See Castillo,* ¶ 37 n.4 (citing but not deciding whether to apply the sufficiency of the evidence standard used in Texas).

¶ 26　　According to Mr. Knapp's own testimony, A.J.'s initial "attack" on him (in which she allegedly ran her truck into him) occurred just after he approached A.J.'s car window, attempted to talk to her, and started walking around her truck to get in on the passenger's side. And her second "attack" (in which she allegedly hit him in the back and head) occurred just after he again approached her truck,

grabbed at her door handle and window to get in, shattered the window, and reached inside to take her keys from her. These events happened only after Mr. Knapp spent hours barraging A.J. with angry texts in which he called her derogatory names, asked about her whereabouts, revealed that he was tracking her location, and suggested he was damaging things at her house. And, according to A.J., they happened after an encounter earlier that day in which he raced up to her truck, tapped her bumper, and left only after they passed a sheriff's deputy.

¶ 27 We are satisfied that the altercation at A.J.'s truck and the events leading up to it were all part of a single, continuous episode. *See Marquez v. People*, 2013 CO 58, ¶¶ 9, 16 (defining an "incident," for purposes of applying the legislative requirements for sentencing crimes of violence, as "a single, rather than more than one, happening or unit of experience," considering such factors as time, place, circumstances, and schematic wholeness); *Castillo*, ¶ 48 (finding *Marquez*'s definition "instructive" in determining whether events were part of a single episode for purposes of giving an instruction on the initial aggressor exception to self-defense).

11

¶ 28     But, even considering only the encounter at A.J.'s truck, there was sufficient evidence to support the instruction. Mr. Knapp's testimony regarding that encounter was itself sufficient to support a finding that he intended to provoke A.J. into attacking him as a pretext for injuring her. And, of course, the jury was "entitled to accept parts of [his] testimony and reject other parts," *Gordon v. Benson*, 925 P.2d 775, 778 (Colo. 1996), particularly given that A.J. and her daughter gave a completely different account of the encounter from his. If the jury believed even some of what A.J. and her daughter said (which it apparently did, given the convictions on several other counts), it could've found that Mr. Knapp intentionally provoked any attack by A.J. that may have led him to act in self-defense. Thus, there was ample basis to support a finding of provocation.

¶ 29     Therefore, we conclude that the trial court didn't err in instructing the jury on the provocation exception to self-defense.

### B.     "Wife Beater" Comment

¶ 30     Mr. Knapp contends that the trial court abused its discretion by admitting evidence that A.J.'s brother-in-law called him a "wife beater." We disagree.

12

¶ 31     We review the trial court's evidentiary rulings for an abuse of

discretion. *People v. Brown*, 2014 COA 155M-2, ¶ 5. A trial court

abuses its discretion when it misconstrues or misapplies the law, or

when its decision is manifestly arbitrary, unreasonable, or unfair.

*People v. Sosa*, 2019 COA 182, ¶ 10.

¶ 32     The trial court allowed the prosecutor to introduce A.J.'s

brother-in-law's comment referring to Mr. Knapp as a "wife beater"

as res gestae evidence to provide context and explain Mr. Knapp's

motive for his actions. As to motive, the prosecutor argued that

Mr. Knapp acted both out of anger that A.J. failed to stand up for

him after her brother-in-law made this comment and out of jealousy

that A.J. might have gone to see her ex-boyfriend.

¶ 33     Res gestae evidence is "generally linked in time and

circumstances with the charged crime, forms an integral and

natural part of an account of a crime, or is necessary to complete

the story of the crime for the jury." *People v. Miranda*, 2014 COA

102, ¶ 47 (quoting *People v. Greenlee*, 200 P.3d 363, 368 (Colo.

2009)). Such evidence provides a jury "a full and complete

understanding of the events surrounding the crime and the context

in which the charged crime occurred," such as showing the

defendant's motive and intent. *Id.* at ¶¶ 47-48 (citation omitted). To be admissible, res gestae evidence must be relevant, and its relevance must not be outweighed by the danger of unfair prejudice. *People v. Thomeczek*, 284 P.3d 110, 114 (Colo. App. 2011).

¶ 34     Mr. Knapp doesn't argue that the "wife beater" comment was improperly regarded as res gestae evidence. Instead, he claims the trial court abused its discretion by overruling his hearsay and CRE 403 objections to the evidence. We are not persuaded.

### 1.     Hearsay

¶ 35     As to hearsay, we conclude that the trial court acted within its discretion in overruling Mr. Knapp's objection. In doing so, we agree with the trial court that the comment was not hearsay, as it was offered not to prove the truth of the matter asserted but, rather, to show its effect on the listener.

¶ 36     Hearsay is a statement, other than one made by a declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. CRE 801(c). "If an out-of-court statement is not offered for its truth, it is admissible as nonhearsay evidence as long as it is relevant." *People v. Van Meter*, 2018 COA 13, ¶ 64. More specifically, an out of court statement offered solely

14

to show its effect on the listener is not hearsay. *People v. Robinson*, 226 P.3d 1145, 1151 (Colo. App. 2009).

¶ 37     Here, the prosecutor offered evidence concerning the "wife beater" comment, not to establish that Mr. Knapp was a wife beater, but to show the comment's effect on Mr. Knapp. The statement's relevance was in how it enraged Mr. Knapp and led him to commit the criminal acts charged in this case.

¶ 38     Indeed, A.J.'s brother-in-law, who reportedly made the comment, didn't even testify at trial. Nor did any witness refer to any specific acts of domestic violence Mr. Knapp had allegedly committed in the past. Most of the references to the "wife beater" comment came from A.J.'s testimony about how Mr. Knapp reacted after hearing the comment and how he continued referring to it over the course of the weekend, Mr. Knapp's testimony about how he felt when he heard the comment, and Mr. Knapp's texts to A.J. referring to the comment and expressing dismay that A.J. hadn't defended him when her brother-in-law made it.

¶ 39     Nonetheless, Mr. Knapp argues that the prosecutor impermissibly relied on the comment for its truth at two points during the trial: in cross-examining him, when the prosecutor

asked why Mr. Knapp believed the comment referred to him and why A.J.'s brother-in-law would call him a wife beater; and in closing argument, when he asserted that Mr. Knapp "fulfilled the prophecy he was upset about earlier in the week" by committing the charged acts of domestic violence. But these references didn't directly imply that the comment was true at the time it was made. Rather, the reference in cross-examination delved into why Mr. Knapp reacted to the comment the way he did, and the reference in closing suggested Mr. Knapp had committed domestic violence after (not before) the comment was made.

### 2.    CRE 403

¶ 40    As to CRE 403, we conclude that the trial court acted within its discretion by ruling that the probative value of the comment wasn't substantially outweighed by the danger of unfair prejudice.

¶ 41    CRE 403 strongly favors the admission of evidence. *People v. Dominguez*, 2019 COA 78, ¶ 29. But even relevant evidence may be excluded where it is unfairly prejudicial. *Id.* To be excluded, the danger of unfair prejudice must substantially outweigh the legitimate probative value of the evidence. *Id.*

¶ 42    In reviewing the evidence on appeal, we "must afford [it] the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." *Id.* at ¶ 30 (quoting *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995)). Evidence isn't unfairly prejudicial simply because it damages the defendant's case. *Id.* Instead, to be unfairly prejudicial, it "must have an 'undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.'" *Id.* (quoting *People v. Dist. Court*, 785 P.2d 141, 147 (Colo. 1990)).

¶ 43    Here, the trial court acted within its discretion in concluding that the danger of unfair prejudice didn't substantially outweigh the comment's probative value. We agree with the trial court that any prejudicial impact of the comment was diminished by "the serious nature of the accusations" made at trial, including the specific allegations of assault A.J. and her daughter detailed in their testimony. The comment was also general in nature, limiting its potential prejudicial impact.

¶ 44    In contrast, the comment was highly relevant as res gestae evidence to provide context for Mr. Knapp's mood throughout the

17

weekend and to establish a possible motive for his criminal conduct. Mr. Knapp heard the comment a few days before he committed the offenses and, by his own admission, remained upset about the comment — and A.J.'s failure to defend him from it — through the date of the offenses. And, even if Mr. Knapp's jealousy toward A.J.'s ex-boyfriend offered an additional potential motive, evidence about his reactions to the "wife beater" comment still provided necessary context and helped the jury have a full and complete understanding of the events leading up to the crimes. *See Miranda*, ¶ 47.

¶ 45    Accordingly, we conclude that the trial court didn't abuse its discretion by admitting evidence of the "wife beater" comment.

## C.    Prosecutorial Misconduct

¶ 46    Mr. Knapp contends that the prosecutor committed misconduct by (1) eliciting testimony about his post-arrest silence and (2) arguing at closing that he tailored his testimony to the evidence presented at trial. We disagree as to the first argument. As to the second, we agree the argument was improper but find the prosecutor's misconduct didn't constitute plain error.

¶ 47     We engage in a two-step analysis to review claims of prosecutorial misconduct.  *People v. Robinson*, 2019 CO 102, ¶ 18. First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances.  *Id.*  Second, if we conclude the conduct was improper, we determine whether it warrants reversal according to the applicable standard of review. *Id.*  Here, because Mr. Knapp's attorney didn't raise his objections at trial, the plain error standard applies.  *See id.* at ¶ 19.  Plain error addresses error that was obvious and substantial and so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.  *Id.* In the context of plain error review of prosecutorial misconduct, we will reverse only when the misconduct was "flagrantly, glaringly, or tremendously improper."  *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).  Prosecutorial misconduct rarely constitutes plain error.  *Van Meter*, ¶ 26.

### 1.     Post-Arrest Silence

¶ 48     Mr. Knapp first complains about the prosecutor's questions on cross-examination inquiring about his statements to law

enforcement on the night he was arrested.  The colloquy about

which he complains went as follows:

> Q  Okay.  And is that when Police were there?
>
> A  Yes, sir.
>
> Q  All right.  And that's when you told them that you and [A.J.] had a fight that night, right?
>
> A  Yes.
>
> Q  Okay.  And you said, though, that it was only verbal, right?
>
> A  Yes, sir.
>
> Q  Okay.  But that wasn't exactly true, was it?
>
> A  No, sir.
>
> Q  Okay.  And -- now, you could have told Police at that moment that [A.J.] hit you with the car, right?
>
> A  Yes, sir.
>
> Q  But you didn't?
>
> A  Correct.
>
> Q  Okay.  And you didn't seek medical attention for this injury on your head you testified about?
>
> A  I did not.

Q Okay.  And you could have told Police about how concerned you were that the kids were in the car with [A.J.] that day, right?

A Yes, sir.

Q Okay.  But you didn't?

A Correct.

Q Okay.  Instead, you told them that you had a verbal argument, right?

A Correct.

¶ 49 Mr. Knapp contends that this questioning improperly inquired into his post-arrest silence.  We are not persuaded.

¶ 50 A prosecutor can neither present evidence of nor comment on a defendant's post-arrest silence.  *People v. Coleman*, 2018 COA 67, ¶ 34.  This is because a prosecutorial comment that has the effect of creating an inference of guilt by referring to the defendant's silence "effectively penalizes the defendant for exercising [the] constitutional privilege" against being compelled to act as a witness against himself or herself.  *Id.* (quoting *People v. Ortega*, 198 Colo. 179, 182, 597 P.2d 1034, 1036 (1979)).

¶ 51 But not every reference to a defendant's post-arrest silence warrants reversal.  *People v. Davis*, 312 P.3d 193, 198 (Colo. App.

2010), *aff'd on other grounds*, 2013 CO 57. For instance, as relevant here, "[a] testifying defendant may . . . be cross-examined on his partial silence where he makes a statement to law enforcement officials but the statement omits significant details which are later included in a subsequent statement." *Id.* at 199. As prior divisions of our court have put it: "A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits." *Id.* (quoting *People v. Rogers*, 68 P.3d 486, 492 (Colo. App. 2002)). In such a situation, the omission of key details is akin to a prior inconsistent statement, and inquiring about those details is permissible because it doesn't seek to have jurors infer guilt from silence but, rather, seeks to respond to statements made by the defendant. *Id.*; *accord People v. Quintana*, 665 P.2d 605, 610 n.7 (Colo. 1983).

¶ 52 Here, the prosecutor's questioning focused primarily on Mr. Knapp's statements to law enforcement authorities (before he was arrested and invoked his right to remain silent) that he and A.J. had had a fight that was "only verbal," as contrasted with his testimony at trial that A.J. had hit him with her car. The questions didn't suggest that Mr. Knapp's post-arrest silence should be

22

construed as evidence of guilt. Instead, they attempted to impeach Mr. Knapp's trial testimony by pointing to his prior inconsistent statement that the fight had been only verbal. Therefore, the questions were proper.

¶ 53    *People v. Reynolds*, 194 Colo. 543, 575 P.2d 1286 (1978), on which Mr. Knapp primarily relies, is distinguishable. In that case, as in this one, the defendant talked briefly with law enforcement officers before invoking his right to remain silent. *Id.* at 550, 575 P.2d at 1292. But there, unlike here, the defendant made only a few vague statements to officers about the incident and later was asked why he didn't provide the additional details to which he testified at trial. *Id.* The critical difference in this case is that Mr. Knapp provided specific information to officers — saying the altercation was strictly verbal — that was inconsistent with his later statements at trial. Thus, the questioning didn't inquire so much into his post-arrest silence as into his prior inconsistent statement.

## 2.    Tailoring

¶ 54    Mr. Knapp also complains about the prosecutor's statements in closing argument, which he claims impermissibly argued that he tailored his testimony to the evidence.

¶ 55    In closing, the prosecutor argued, among other things, that the evidence didn't support Mr. Knapp's claim of self-defense and that his testimony about the events wasn't credible.  The prosecutor then made the following comment, to which defense counsel didn't object, but which Mr. Knapp now challenges on appeal:

> There is not evidence supporting the defendant's claim.  The defendant got to sit and listen to the evidence, and then testify, based upon the evidence heard in court.

The prosecutor went on to argue that A.J. and her daughter had given a credible recounting of the events and that the evidence didn't support Mr. Knapp's theory of self-defense.

¶ 56    A prosecutor's closing argument should be based on the evidence in the record and all reasonable inferences to be drawn from it.  *Martinez v. People*, 244 P.3d 135, 140 (Colo. 2010).  Thus, a prosecutor may draw reasonable inferences from the evidence about the credibility of witnesses.  *Id.* at 141.  But a prosecutor may not make arguments about a defendant's opportunity to tailor evidence simply because the defendant exercises his or her right of confrontation and has a duty to be present at trial.  *Id.*

¶ 57    Whether a prosecutor's tailoring argument runs afoul of these principles depends on whether it is generic or specific. Generic tailoring — which is improper — occurs when the prosecutor attacks the defendant's credibility by "simply drawing the jury's attention to the defendant's presence at trial and his resultant opportunity to tailor his testimony," without "referenc[ing] any instances in the record where the defendant actually engaged in tailoring." *Id.* By contrast, specific tailoring — which is proper — occurs when the prosecutor ties a tailoring argument to an evidentiary basis in the record. *Id.* For instance, our supreme court has explained that a reference to "facts in the record indicating that a defendant has tailored 'specific elements of his testimony to fit with particular testimony given by other witnesses'" is specific tailoring and therefore permissible. *Id.* (citation omitted).

¶ 58    Here, the People claim the prosecutor's comment in closing that Mr. Knapp "got to sit and listen to the evidence, and then testify, based upon the evidence heard in court" was neither a generic nor a specific tailoring argument because the prosecutor argued, both before and after the comment, that Mr. Knapp's testimony was not credible or consistent with the evidence. In other

25

words, the People claim the prosecutor's point was that Mr. Knapp had had the opportunity to tailor his testimony but nonetheless hadn't done so. Thus, they contend, the argument wasn't really tailoring at all and was permissible.

¶ 59    The People don't cite any authority supporting this novel argument, and we haven't found any. And the prosecutor's tailoring comment was generic, as neither the comment itself nor the arguments that immediately preceded and followed it were tied to any specific testimony at trial. Instead, the comment "attack[ed] [Mr. Knapp's] credibility by simply drawing the jury's attention to [his] presence at trial and his resultant opportunity to tailor his testimony." *Id.* Therefore, it was improper.

¶ 60    However, we don't believe the prosecutor's tailoring comment rose to the level of plain error. Rather, we conclude that, even assuming the error in allowing the comment was obvious, it wasn't substantial and didn't so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of Mr. Knapp's conviction. *See Robinson,* ¶ 18.

¶ 61    We reach this conclusion for several reasons. First, the prosecutor made only one brief reference to tailoring in the course

26

of a lengthy closing argument. *See People v. Villa,* 240 P.3d 343, 358 (Colo. App. 2009). Second, as the People note, the prosecutor didn't directly argue that Mr. Knapp had in fact tailored his testimony. Rather, the implication was that he'd had the opportunity to do so but hadn't. This softened the impact and rendered the argument less potentially harmful. Third, defense counsel's lack of an objection "may demonstrate [a] belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Domingo-Gomez,* 125 P.3d at 1054 (citation omitted). And fourth, the court provided the jury with a proper credibility instruction, which we must assume the jury followed. *See Villa,* 240 P.3d at 358.

¶ 62     As a result, we cannot say that the prosecutor's tailoring argument was "flagrantly, glaringly, or tremendously improper," *Domingo-Gomez,* 125 P.3d at 1053 (quoting *Avila,* 944 P.2d at 676), and "so undermine[d] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict," *id.* Therefore, we find no plain error.

## D.    Restitution

¶ 63    Mr. Knapp raises two primary arguments in challenging the trial court's restitution order.  First, he argues that the court imposed a greater amount of restitution than that authorized by the jury's verdict.  Second, he argues that the court erroneously calculated restitution using the replacement value of several items of property without the necessary foundation.  We agree with him on the first issue and remand to the trial court with instructions, but we find no plain error as to the second issue.

¶ 64    The prosecution's criminal mischief charge against Mr. Knapp alleged that he knowingly damaged A.J.'s real or personal property in violation of section 18-4-501(1), C.R.S. 2019.  The prosecution charged criminal mischief as a class 6 felony, alleging that Mr. Knapp caused $1000 or more but less than $5000 in damages to A.J.'s property.  § 18-4-501(4)(d).  A.J. testified at trial that Mr. Knapp caused more than $13,000 in damage to her truck, her camper, and various items at her house.  Although the jury found Mr. Knapp guilty of the offense of criminal mischief, it found, in a series of interrogatories corresponding to the different levels of offense, that the aggregate damage Mr. Knapp caused to A.J.'s

property was $750 or more but less than $1000. The court therefore entered a conviction for a class 1 misdemeanor.

¶ 65    After trial, the prosecution filed a motion seeking $13,070.40 in restitution for two types of pecuniary losses: (1) $11,155.54 for property Mr. Knapp damaged or destroyed and (2) $1914.86 for other losses resulting from Mr. Knapp's conduct, including lost wages and school books.[3]  A.J. had testified about the same items of damage at trial, though she gave slightly smaller damage estimates for some of the items during the restitution proceedings. Defense counsel objected on the basis that the request exceeded the amount supported by the jury's interrogatory on criminal mischief.

¶ 66    Following an evidentiary hearing, the trial court ordered restitution in the full $13,070.40 requested, though it noted that some of that amount was directly payable to A.J. and some was payable to her landlords.

---

[3] A.J. sought reimbursement for books she'd purchased for a semester of school she could no longer attend due to her injuries from the assault.  Initially, she also requested tuition reimbursement, but she withdrew that request when she obtained a refund on the tuition.

### 1. Acquitted Conduct

¶ 67 Mr. Knapp contends that the trial court erred by awarding restitution in an amount exceeding that supported by the jury's interrogatory on the criminal mischief count. We agree in part.

¶ 68 We review a trial court's restitution order for an abuse of discretion. *Sosa,* ¶ 10. A court abuses its discretion when it misconstrues or misapplies the law, or when its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 69 We review questions of statutory construction de novo. *Id.* at ¶ 11. We likewise review questions of law de novo, and whether a trial court has authority to impose restitution for losses suffered as a result of acquitted conduct is a question of law. *Cowen,* ¶ 11; *Sosa,* ¶ 11.

¶ 70 Our primary purpose in interpreting a statute is "to ascertain and give effect to the General Assembly's intent." *Cowen,* ¶ 12 (citation omitted). We first examine the plain meaning of the statutory language, construing terms according to their statutory definitions or plain and ordinary meanings. *Id.* at ¶¶ 12, 14. If the language is clear and unambiguous, we give effect to its plain meaning without looking any further. *Id.* at ¶ 12. In applying the

30

plain meaning, we give consistent effect to all parts of the statute, construe each provision in harmony with the overall statutory design, and give effect to all legislative acts if possible. *Id.* at ¶ 13.

¶ 71 Restitution in criminal cases is part of a trial court's sentencing function. *Roberts v. People*, 130 P.3d 1005, 1006 (Colo. 2006); *see also* § 18-1.3-603, C.R.S. 2019. Section 18-1.3-603(1) provides that "[e]very order of conviction of a felony, misdemeanor, petty, or traffic misdemeanor offense . . . shall include consideration of restitution." The statute defines restitution as "any pecuniary loss suffered by a victim . . . [that is] proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." § 18-1.3-602(3)(a), C.R.S. 2019. "We liberally construe the restitution statute to accomplish its goal of making victims whole for the harms suffered as the result of a defendant's criminal conduct." *Sosa*, ¶ 14 (quoting *People v. Rivera*, 250 P.3d 1272, 1274 (Colo. App. 2010)).

¶ 72 However, a sentence that exceeds the court's statutory authority is illegal. *Roberts*, 130 P.3d at 1006. Our supreme court recently made clear that "Colorado's restitution statutes do not allow a trial court to impose restitution for pecuniary losses caused

31

by conduct that formed the basis of a charge of which the defendant has been acquitted[,] [e]ven where . . . the defendant has been convicted of a separate charge." *Cowen*, ¶ 2; *accord id.* at ¶ 24. In other words, "when an individual is acquitted of one charge and convicted of another, the conduct underlying the acquitted charge cannot serve as the basis of a restitution order." *Id.* at ¶ 23.

¶ 73 The court in *Cowen* largely based its ruling on a close reading of the restitution statutes, concluding that "the legislature's choice of wording reflects its intent to exclude from the restitution umbrella any losses caused by acquitted conduct." *Id.* at ¶ 22; *see also id.* at ¶ 19 ("The legislature clearly meant to limit restitution liability to individuals *found guilty* of causing injury or property loss that resulted in suffering or hardship to victims harmed by their misconduct."); *id.* at ¶ 21 ("[T]he legislature did not intend to empower trial courts to order someone acquitted of a charge to pay restitution for losses caused by the conduct underlying that charge.").

¶ 74 The *Cowen* court also stated that a contrary holding would raise constitutional concerns in the wake of the United States Supreme Court's decision in *Nelson v. Colorado*, 581 U.S. ___, 137

S. Ct. 1249, 1252, 1255-56 (2017), which held that, when a criminal conviction is overturned or vacated and there is no retrial or a retrial results in an acquittal, the state must refund all restitution imposed on the defendant as a result of the conviction. *See Cowen,* ¶¶ 34-37.  As the *Cowen* court noted, "the Court [in *Nelson*] reminded us that, '[a]bsent conviction of a crime, one is presumed innocent' . . . [and] explained that . . . 'Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions.'"  *Id.* at ¶ 35 (quoting *Nelson,* 581 U.S. at ___, ___, 137 S. Ct. at 1252, 1256).

¶ 75     Recognizing that this presumption of innocence applies to each crime charged, the *Cowen* court expressed that, "[i]f the jury acquits a defendant of a particular charge, the defendant retains the presumption of innocence with respect to that charge regardless of whether he is found guilty of a different charge."  *Id.* at ¶ 38.  "To hold otherwise," the court explained, "would be tantamount to declaring that when the jury finds a defendant guilty of one charge and not guilty of another, the trial court may nevertheless consider the defendant guilty of the acquitted charge by a less demanding

33

standard of proof" — a result the court found "would be nonsensical even in the context of restitution." *Id.*

¶ 76    The *Cowen* court applied this rule to hold that the defendant in that case, who was charged with two counts of fraud by check based on two separate checks and was convicted of one count but acquitted of the other, couldn't be ordered to pay restitution in the total amount of both checks. *Id.* at ¶¶ 5-6, 39-42. The court held that, because the jury had acquitted the defendant of the fraud charge relating to the second check, the trial court lacked authority to order the defendant to pay restitution for any pecuniary losses suffered as a result of that check. *Id.* at ¶¶ 39-42.

¶ 77    The procedural posture of this case is different than that of *Cowen,* but we conclude that the same reasoning applies. The prosecution charged Mr. Knapp with criminal mischief as a class 6 felony (based on damage of at least $1000 but less than $5000), but the jury found, through its interrogatories, that he committed only a class 1 misdemeanor (based on damage of at least $750 but less than $1000). We agree with Mr. Knapp that the jury's guilty verdict on misdemeanor criminal mischief should be viewed as an implied

(if not express) acquittal of the felony criminal mischief count charged by the prosecution.

¶ 78    Ordinarily, a defendant is impliedly acquitted of a greater offense when he or she is charged with greater and lesser offenses and the jury finds him or her guilty of only the lesser offense.  *See, e.g.*, § 18-1-301(1)(a), C.R.S. 2019; *People v. Cardenas*, 25 P.3d 1258, 1261 (Colo. App. 2000).  Technically speaking, the value of the property damaged operates as a sentence enhancer rather than an element of the offense of criminal mischief and, thus, these were not in fact greater and lesser included offenses.  But, because the sentence enhancer had to be pleaded, proved, and found beyond a reasonable doubt by a jury, it makes sense to apply the same construct.  *See People v. Jamison*, 220 P.3d 992, 995 (Colo. App. 2009) (acknowledging that theft of property valued between $100 and $500 technically wasn't a lesser included offense of theft of property valued between $500 and $15,000, but treating it as such for purposes of entering judgment for the lesser offense supported by the evidence); *see also People v. Hopkins*, 2013 COA 74, ¶¶ 22-23 (recognizing that any finding that increases the maximum

penalty for a crime must be proved to a jury, regardless of whether that fact is an element or a sentence enhancer).

¶ 79    In this case, through its interrogatories, the jury plainly found that Mr. Knapp was not guilty of the greater offense but was guilty of the lesser one. Thus, Mr. Knapp was essentially acquitted of class 6 felony criminal mischief, even as he was convicted of class 1 misdemeanor criminal mischief. Under the reasoning in *Cowen*, then, he retains a presumption of innocence with respect to any actions of (or damages for) criminal mischief beyond the amount equating to a class 1 misdemeanor offense — that is, $999.99.

¶ 80    Accordingly, just as the trial court in *Cowen* lacked authority to order restitution for the second check after the jury found the defendant hadn't committed fraud as to that check, so did the trial court here lack authority to order restitution for additional property damage based on the criminal mischief count after the jury found Mr. Knapp hadn't committed criminal mischief as to any more than $999.99 in property damage.

¶ 81    We therefore hold that, where a defendant is charged with one level of offense but is convicted of only a lower-level offense, an award of restitution for that offense is limited to the amount

consistent with the jury verdict. Thus, here, where Mr. Knapp was charged with criminal mischief as a class 6 felony but was convicted for this offense only as a class 1 misdemeanor, restitution for the offense is limited to the maximum amount of $999.99 set out for a class 1 misdemeanor. To the extent that prior divisions of this court reached different conclusions under similar facts, we believe their holdings are no longer valid after the supreme court's decision in *Cowen*. Indeed, part of the reasoning in those decisions was that trial courts could consider acquitted conduct in determining the amount of restitution, *see, e.g., People v. Stotz*, 2016 COA 16, ¶¶ 89-91; *People v. Pagan*, 165 P.3d 724, 730-31 (Colo. App. 2006), and *Cowen* expressly held that that is not the case.[4]

¶ 82    The People point to other cases where divisions of this court allowed restitution awards to exceed the amount of a jury verdict for a different reason: the pecuniary losses were calculated differently

---

[4] Some of these decisions added that trial courts could consider uncharged conduct as well in determining the amount of restitution. A division of this court recently held that this also is no longer proper after *Cowen*. *See People v. Sosa*, 2019 COA 182, ¶¶ 24-28.

for purposes of restitution than for purposes of proving an element of an offense. *See, e.g., People v. Smith*, 181 P.3d 324, 327 (Colo. App. 2007). But, in this case, the People don't explain how any minor variations in the calculation of damages for restitution purposes — for instance, in counting repair costs that exceed the value of an object or using replacement value as opposed to fair market value — could account for the significant difference between the amount of restitution the trial court awarded and the amount supported by the jury's verdict. In fact, it appears from the record that such variations don't account for *any* of this difference, for two reasons. First, the property damage calculations A.J. presented during the restitution proceedings were nearly identical to those she had presented at trial, just slightly lower (not higher). And second, the jury instructions didn't constrain what the jury could consider in calculating the amount of property damage Mr. Knapp had caused. Thus, any difference in the way restitution may be calculated doesn't justify increasing the amount of restitution above the amount supported by the jury's verdict.

¶ 83    We hold, however, that the restitution may be supported by property and nonproperty losses attributable to other offenses for

which Mr. Knapp was convicted. For instance, the trial court appropriately awarded restitution for lost wages ($1800) and unneeded school books ($114.86), which are attributable to Mr. Knapp's assault on A.J., causing her to miss work and drop out of school for the semester.[5] Likewise, the court appropriately awarded restitution for the cost to replace a mattress and bedding ($3834.98), which is attributable to Mr. Knapp's illegal discharge of a firearm, putting two holes in the mattress, and to his assault, causing blood to stain the bedding. The same is true of the cost to replace carpet ($1300) stained by blood as a result of Mr. Knapp's assault. Because it's not entirely clear from the record what

---

[5] Even if these losses hadn't been attributable to a different offense, they still would've been recoverable. The jury's verdict on criminal mischief pertained only to damages to real and personal property. *See* § 18-4-501, C.R.S. 2019. But the restitution statute more broadly allows for recovery of "any pecuniary loss," including, among other things, "out-of-pocket expenses" and "other losses or injuries [that are] proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." § 18-1.3-602(3)(a), C.R.S. 2019. Accordingly, while the jury's verdict precluded the trial court from awarding restitution based on the criminal mischief count for real and personal property damage in an amount greater than $999.99, it didn't affect the trial court's ability to award restitution for other types of pecuniary losses.

additional items, if any, may properly be attributed to other offenses, we remand for the trial court to make that determination.

¶ 84     We recognize that some of these items, like the damage to the mattress and bedding, could be perceived as attributable to the criminal mischief count as well as the other counts — and thus, conceivably, the amount of restitution for these items could be limited by the jury's verdict on criminal mischief.  But Mr. Knapp doesn't maintain a presumption of innocence as to those actions and damages, since he was found guilty of the other offenses to which they relate and since, even in the absence of a guilty verdict on criminal mischief, the value of those items would've been recoverable in restitution.  We are also mindful of the fact that the restitution statute must be liberally construed "to accomplish its goal of making victims whole for the harms suffered as the result of a defendant's criminal conduct."  *Sosa*, ¶ 14 (quoting *Rivera*, 250 P.3d at 1274).

¶ 85     Thus, the maximum amount of restitution the trial court could lawfully order was $8049.83 ($999.99 plus the amount of the items listed above) plus the amount of any additional items the trial court

determines on remand are properly attributable to offenses other than (or in addition to) criminal mischief.

¶ 86    Finally, we reject Mr. Knapp's argument that any award of restitution in an amount greater than $999.99 (the amount in the jury's interrogatories) violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).  We agree with the division of this court that previously concluded that *Apprendi* and *Blakely* — which hold that any fact, other than the fact of a prior conviction, that increases the penalty for an offense beyond the prescribed statutory maximum must be admitted by the defendant or proved to a jury beyond a reasonable doubt — don't apply to restitution orders.  *See Smith*, 181 P.3d at 327.  We also note that nothing in the supreme court's decision in *Cowen* calls that conclusion into question and that, following *Southern Union Co. v. United States*, 567 U.S. 343 (2012), federal courts have consistently continued to recognize that *Apprendi* doesn't apply to restitution, *see, e.g., United States v. Sawyer*, 825 F.3d 287, 297 (6th Cir. 2016); *United States v. Thunderhawk*, 799 F.3d 1203, 1209 (8th Cir. 2015); *United States v. Bengis*, 783 F.3d 407, 413 (2d Cir.

2015); *United States v. Rosbottom*, 763 F.3d 408, 420 (5th Cir. 2014); *United States v. Day*, 700 F.3d 713, 732 (4th Cir. 2012).

¶ 87     Accordingly, we reverse the restitution order and remand to the trial court to modify the amount of restitution to $8049.83 plus the amount of any additional items the trial court determines on remand are properly attributable to offenses other than (or in addition to) criminal mischief.[6]

2.     Replacement Value

¶ 88     Mr. Knapp also contends that the trial court erroneously calculated restitution using the replacement value of several items of property without the necessary foundation.

¶ 89     Section 18-1.3-602(3)(a) defines restitution to include "any pecuniary loss suffered by a victim," including but not limited to "all out-of-pocket expenses, . . . anticipated future expenses, . . . and other losses or injuries proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." Accordingly, "the value of property for purposes of restitution is

---

[6] We also leave it to the trial court to determine how to allocate the restitution as between A.J. and her landlords.

42

determined by the victim's 'actual, pecuniary loss' or the amount of money that will 'fulfill[ ] the statutory purpose of simply making the victim whole to the extent practicable.'" *People v. Stafford*, 93 P.3d 572, 575 (Colo. App. 2004) (quoting *People v. Courtney*, 868 P.2d 1126, 1128 (Colo. App. 1993)).

¶ 90    Recognizing that victims are entitled to be placed in the same financial condition they would've been in had the crime not been committed, prior divisions of this court have recognized that a court can award restitution of a "reasonable replacement value" — rather than being limited to recovery of fair market value — when the victim demonstrates that he or she will need to replace an item that isn't readily replaceable at a fair market value cost. *Stafford*, 93 P.3d at 575-76; *accord People v. Henson*, 2013 COA 36, ¶ 24.

¶ 91    Mr. Knapp argues that A.J.'s restitution calculations for several items were based on replacement value, rather than fair market value, and that the trial court adopted those calculations and awarded those amounts notwithstanding the lack of any evidence demonstrating that A.J. needed to replace the items and

couldn't readily do so at a fair market value cost.  Because defense counsel didn't raise this issue below, our review is for plain error.[7]

¶ 92    Mr. Knapp challenges only those portions of the restitution award for which the calculations were based on replacement value. These include the restitution awarded for the replacement of two cell phones, a towel rack, a mattress and bedding, carpet, a home phone, a computer and printer, a refrigerator, a microwave, a dishwasher, other kitchen items, and a wind chime.

¶ 93    Mr. Knapp cites only two cases in urging that the trial court plainly erred by awarding the replacement value of these items without evidence demonstrating that they weren't readily replaceable at fair market value cost.  But in those two cases, divisions of this court held merely that "the award of a reasonable replacement value is appropriate when the victim demonstrates that he or she must or will replace an item that is not readily replaceable at a fair market value cost."  *Stafford*, 93 P.3d at 575-76; *see also*

---

[7] Mr. Knapp claims that, despite the lack of any objection, the trial court ruled on this issue by saying it wasn't limited to a fair market valuation determination and just had to make sure the value was reasonable to make the victim whole.  We disagree.

44

*Henson,* ¶ 24 (quoting the same language from *Stafford*). The divisions didn't hold that evidence that an item is not readily replaceable at fair market value cost is always a necessary predicate to recovery of reasonable replacement value. Critically, in both cases, the objections had apparently been preserved in the trial court and the divisions approved the use of replacement value. *Henson,* ¶¶ 22-27; *Stafford,* 93 P.3d at 576.

¶ 94    Here, where defense counsel made no objection to the use of replacement value and where it was fair to assume (in the absence of evidence or argument indicating otherwise) that there wasn't a broad and active used market for items like a mattress, bedding, carpet, and kitchen appliances, we conclude that it wasn't plain error for the court to award restitution based on replacement value. And even for the items as to which there might be a used market, like the cell phone, computer, and printer, we cannot conclude that the trial court's decision to award replacement value rose to the level of plain error. *See Stafford,* 93 P.3d at 576 ("[T]he trial court reasonably assumed that there was not a broad and active market for used computers comparable to those stolen, particularly considering today's constantly evolving technological

marketplace."); *see also United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999) (recognizing, under the federal restitution statute, that replacement cost may be a better measure of value when "an item is unique" or "there is not a broad and active market for it"), *cited with approval in Stafford*, 93 P.3d at 576.

¶ 95 Therefore, we discern no plain error in the trial court's use of replacement value in calculating the amount of restitution.

### III.  Conclusion

¶ 96 We affirm Mr. Knapp's convictions.  However, we reverse the restitution order and remand to the trial court to (1) determine what items of restitution, if any, are properly attributable to offenses other than (or in addition to) criminal mischief, in addition to the lost wages, school books, mattress and bedding, and carpet addressed in this opinion, and (2) modify the amount of restitution to $8049.83 plus the amount of any such items.

JUDGE J. JONES and JUDGE WELLING concur.