The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 7, 2024

## 2024COA119

**No. 22CA0792, *People v. Feldman* — Government — County
Officers — Coroner — Cause and Manner of Death;
Constitutional Law — Separation of Powers — Subdelegation
Doctrine**

As a matter of first impression, a division of the court of
appeals holds that, when the county coroner certifies the cause and
manner of a victim's death as "undetermined," the prosecution may
present other evidence regarding the cause and manner of the
victim's death in a subsequent criminal proceeding, even if it
conflicts with the coroner's determination.  The division rejects the
defendant's argument that the prosecution's expert witness
usurped the county coroner's sole authority to determine the cause
and manner of the victim's death, thereby violating either the
subdelegation doctrine or the separation of powers doctrine.

Because the division rejects the defendant's remaining contentions on appeal — that the district court erred by admitting improper expert testimony, denying defense counsel's motion for a mistrial, and admitting improper character evidence — the defendant's conviction for first degree murder is affirmed.

Court of Appeals No. 22CA0792
City and County of Denver District Court No. 18CR1121
Honorable Edward D. Bronfin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Robert W. Feldman,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE TAUBMAN*
Lipinsky and Sullivan, JJ., concur

Announced November 7, 2024

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Haddon, Morgan & Foreman, P.C., Jeffrey S. Pagliuca, Adam Mueller, Denver,
Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Robert W. Feldman, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder.  Because we reject Feldman's constitutional argument that the prosecution's expert usurped the county coroner's sole authority by testifying about the cause and manner of the victim's death and reject his other challenges, we affirm.

## I.     Background

¶ 2     Feldman and the victim were married and had two children.

¶ 3     Around 9 a.m. on March 1, 2015, Feldman drove the children to Sunday school.  The victim had planned to pick them up at noon and take them to a Purim carnival,[1] but she never showed up to school and did not answer her phone when the school's director called her.

¶ 4     Shortly after 1 p.m., Feldman picked the children up from school and took them to the carnival.  He and the children returned home around 3 p.m.  At 3:21 p.m., Feldman called 911 to report

---

[1] In their answer brief, the People incorrectly describe the Purim carnival as a "church" carnival.  Purim is a Jewish holiday commemorating the saving of the Jews from a threatened massacre in ancient Persia.  *See* Encyclopedia Britannica, *Purim*, (database updated Oct. 21, 2024), https://perma.cc/D3NT-ZHEM.

that he had found the victim unconscious in the bathtub with the shower running.

¶ 5    When emergency personnel arrived, the victim was lying naked on her back on the bathroom floor; Feldman explained that he had pulled her out of the bathtub. The victim had no pulse, and she did not respond to any medical treatment. Bruises and abrasions covered her body.

¶ 6    An autopsy revealed that the victim had sustained almost all of the injuries before her death. A forensic pathologist also discovered that the victim had an enlarged heart and a variety of chronic health conditions, including kidney disease and obesity, all of which put her at an increased risk of death. The pathologist was unable to determine the cause and manner of the victim's death.

¶ 7    Several months later, the police received a call from S.M., who reported that she and Feldman had engaged in sexual relations three days before the victim died. S.M. told the police that she had contacted the victim about Feldman's affair the morning of the victim's death and that, during their phone call, the victim had told S.M. "I'm done with him"; Feldman had cheated on her before; and she "thought we were past that." The police then took additional

steps to investigate the victim's death as a homicide, including consulting Dr. William Smock, a medical expert who opined that the victim had died from a combination of strangulation and suffocation.

¶ 8    The People charged Feldman with first degree murder.  At trial, the prosecution's primary theory was that Feldman killed his wife because she had discovered his extramarital affair; he feared that she would leave him as a result, so he killed her before she had the chance to do so.

¶ 9    The jury found Feldman guilty as charged.  The district court sentenced him to life in prison without the possibility of parole.

## II.    Discussion

¶ 10    Feldman contends that we must reverse his conviction because the district court erroneously (1) permitted the prosecution to usurp the county coroner's authority by presenting Dr. Smock's testimony regarding the cause and manner of the victim's death; (2) admitted improper expert testimony by Dr. Smock; (3) denied defense counsel's motion for a mistrial; and (4) admitted improper character evidence.  He also contends that the cumulative effect of

these alleged errors warrants reversal. We address and reject each of his contentions in turn.

### A. Cause and Manner of Death

¶ 11 Feldman first asserts that Dr. Smock's testimony usurped the county coroner's sole authority to determine the cause and manner of the victim's death, thereby violating either the subdelegation doctrine or the separation of powers doctrine. We perceive no constitutional violation.

### 1. Additional Background

¶ 12 Dr. Kelly Kobylanski performed the victim's autopsy under the supervision of Dr. Meredith Frank, a forensic pathologist. As noted, the autopsy revealed that the victim had an enlarged heart and a variety of chronic health conditions and that most of the victim's injuries had occurred before she died. Dr. Kobylanski, in consultation with Dr. Frank and the coroner, could not determine how the victim died. Dr. Frank certified the cause and manner of death on the victim's death certificate as "undetermined," explaining that she requires 99.9% certainty before classifying a deceased's manner of death as a homicide and did not have that degree of certainty in this case.

4

¶ 13    Two years later, the prosecution retained Dr. Smock as an expert in strangulation and forensic medicine.  After reviewing the autopsy results and photos of the victim taken the day she died, Dr. Smock wrote a report in which he opined that the victim had died from a combination of strangulation and suffocation.

¶ 14    Defense counsel filed a pretrial motion to exclude Dr. Smock's testimony about the cause and manner of the victim's death, reasoning that such testimony would usurp the coroner's sole authority to determine the cause and manner of the victim's death under sections 30-10-606 and -606.5, C.R.S. 2024.  The district court denied the motion.

¶ 15    At trial, Dr. Smock testified that he believed the victim "died from asphyxia from the combination of strangulation and suffocation, based on the injuries and patterns of the bruising and where the blood went and didn't go."

2.    Standard of Review and Applicable Law

¶ 16    We review questions of law concerning the separation of powers doctrine de novo.  *Hickerson v. Vessels*, 2014 CO 2, ¶ 10, 316 P.3d 620, 623.  That doctrine provides that Colorado's executive, legislative, and judicial branches of government "shall co-

operate with and complement, and at the same time act as checks and balances against one another[,] but shall not interfere with or encroach on the authority or within the province of the other." *Lobato v. State*, 218 P.3d 358, 372 (Colo. 2009) (quoting *Smith v. Miller*, 384 P.2d 738, 741 (Colo. 1963)); *see* Colo. Const. art. III.

### 3.     Analysis

¶ 17     The Colorado Constitution creates the elected office of county coroner.  Colo. Const. art. XIV, § 8.  "The coroner, in cooperation with law enforcement, shall make all proper inquiry in order to determine the cause and manner of death of any person in his or her jurisdiction who has died" and issue a death certificate under certain circumstances including "[w]hen no physician is in attendance."  § 30-10-606(1)(b), (4)(a).  In some cases, "[t]he coroner or his or her designee shall . . . have a forensic autopsy performed" by a board-certified forensic pathologist, a physician who has completed a forensic pathology fellowship and is practicing forensic pathology in Colorado, or a pathology resident or forensic pathology fellow under a board-certified forensic pathologist's supervision. §§ 30-10-606(2), -606.5(2)(a)-(d).

¶ 18    Feldman asserts that these provisions give the coroner or the forensic pathologist whom the coroner orders to perform the autopsy sole discretion to determine the cause and manner of an unattended death and, consequently, preclude the prosecution from presenting testimony regarding the cause and manner of an unattended death from anyone other than those two individuals.  In this regard, he raises two arguments for reversal, both of which we reject.

### a.    Subdelegation Argument

¶ 19    Feldman first argues that, if the coroner is part of the executive branch, the prosecution violated the subdelegation doctrine by introducing Dr. Smock's testimony because that doctrine prevents an agency within one governmental branch from delegating its authority to a "co-equal agency" within the same branch.  Because the district attorney's office and the coroner's office are coequal agencies within the executive branch, his argument continues, "the county coroner could not delegate — and the county prosecutor could not usurp — the power to determine cause and manner of death."

¶ 20    Even if we were to assume that the district attorney's office and the coroner's office are coequal agencies within the executive branch,[2] Feldman has not demonstrated that the subdelegation doctrine applies in Colorado.  He cites no Colorado case, nor are we aware of one, that addresses the doctrine.  The few cases on which he relies are inapposite, as they discuss the concept of subdelegation largely within the federal administrative agency context, which bears no relevance to this case.  *See, e.g., U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 564-66 (D.C. Cir. 2004) (The Federal Communications Commission cannot subdelegate its authority to state commissions, in part because "delegation to outside entities increases the risk that these parties will not share the agency's 'national vision and perspective,' and thus may pursue goals inconsistent with those of the agency and the underlying statutory scheme." (quoting *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 20 (D.D.C. 1999))).

¶ 21    Additionally, even if the subdelegation doctrine applies in Colorado, we conclude that the doctrine is not implicated under the

---

[2] The district attorney's office is part of the executive branch.  *See People v. Dist. Ct.*, 767 P.2d 239, 240 (Colo. 1989).

circumstances of this case because no delegation occurred: The coroner and forensic pathologist performed their duties to conduct a forensic autopsy, determine the cause and manner of death, and issue a death certificate, without delegating them to the district attorney's office. If the prosecution had asked the coroner to change his determination regarding the cause and manner of the victim's death, alter her death certificate, or have her autopsy performed by someone other than a qualified forensic pathologist, the subdelegation doctrine might conceivably apply. However, the prosecution merely exercised its authority to prosecute crimes by presenting evidence at Feldman's trial about how the victim died — an issue that the jury was tasked with deciding. Such evidence is especially helpful where, as here, the coroner and forensic pathologist could not determine how the victim died.

¶ 22    *Carrick v. Locke*, 882 P.2d 173 (Wash. 1994), and *Roark v. Lyle*, 116 N.E.2d 817 (Ohio Ct. Com. Pl.), *aff'd mem.*, 121 N.E.2d 837 (Ohio Ct. App. 1952), on which Feldman relies, are not to the contrary. In *Carrick*, the Washington Supreme Court rejected an argument that permitting a district court judge to conduct a coroner's inquest into a death constitutes an improper delegation of

the coroner's authority. 882 P.2d at 176-79. In *Roark*, the Court of Common Pleas of Ohio ruled that it is unconstitutional for the judiciary to direct a coroner to change his determination regarding the cause and manner of death and alter the death certificate accordingly. 116 N.E.2d at 818-19.

¶ 23 Unlike in *Carrick* and *Roark*, this case does not involve a situation in which someone other than the coroner performed the coroner's duties or one in which someone directed the coroner to change his determination regarding the cause and manner of the victim's death and alter her death certificate. To the contrary, the coroner performed his statutory duties without interference. The performance of those duties in no way precluded the prosecution from presenting other evidence regarding the cause and manner of the victim's death in a subsequent criminal proceeding, even if it conflicted with the coroner's determination. *See Lockwood v. Travelers Ins. Co.*, 498 P.2d 947, 952 (Colo. 1972) (Statements in a death certificate are "rebuttable by evidence, be it direct or circumstantial, which tends to show the actual circumstances surrounding the death.") (citation omitted).

### b.    Separation of Powers Argument

¶ 24    Feldman alternatively argues that, if the coroner is part of the legislative branch, the prosecution, as part of the executive branch, violated the separation of powers doctrine by introducing Dr. Smock's testimony.

¶ 25    We disagree with the parties' assertions that Feldman preserved his separation of powers challenge.  Our review of the record shows that defense counsel never argued that the coroner is part of the legislative branch or that the prosecution otherwise violated the separation of powers doctrine.  Counsel's only argument regarding the prosecution's alleged usurpation of the coroner's authority pertained to the subdelegation doctrine and was premised on the assumption that the coroner is part of the executive branch.  Accordingly, Feldman's separation of powers challenge is subject to plain error review.  *See Reyna-Abarca v. People*, 2017 CO 15, ¶ 47, 390 P.3d 816, 823 (a defendant in a criminal case may raise a constitutional claim for the first time on appeal, and, unless the claim was waived or invited, an appellate court will review it for plain error).

¶ 26    Feldman offers no support for his contention that the coroner is part of the legislative branch.  Feldman cites only the constitutional provision that creates the elected office of county coroner.  *See* Colo. Const. art. XIV, § 8.  Nothing in that provision states or even suggests that the coroner is part of the legislative branch.  Moreover, we agree with the People that there is nothing legislative about a coroner's duties, including the duty to determine the cause and manner of an unattended death — which, according to section 30-10-606(1), shall be done in cooperation with law enforcement officials.[3]  His separation of powers challenge thus fails by its own terms.

## B.    Expert Testimony

¶ 27    Feldman next challenges Dr. Smock's opinions as inadmissible expert testimony.  We reject his challenge.

---

[3] Indeed, many of the coroner's duties overlap significantly with those of law enforcement officials.  *See, e.g.*, § 30-10-604, C.R.S. 2024 ("When there is no sheriff in any county, it is the duty of the coroner to exercise all the powers and duties of the sheriff of his county until a sheriff is appointed or elected and qualified . . . .").

### 1. Standard of Review and Applicable Law

¶ 28    We review a district court's evidentiary rulings for an abuse of discretion. *Kutzly v. People*, 2019 CO 55, ¶ 8, 442 P.3d 838, 841. A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair or if it misapplies the law. *People v. Battigalli-Ansell*, 2021 COA 52M, ¶ 30, 492 P.3d 376, 384.

¶ 29    CRE 702 and CRE 403 govern the admissibility of expert testimony. "[U]nder these evidentiary rules, admissibility of expert testimony requires that the testimony be relevant and reliable, and that the probative value of the evidence not be substantially outweighed by any of the countervailing considerations contained in CRE 403." *Kutzly*, ¶ 10, 442 P.3d at 841. A district court's determination of whether the evidence is reliable "should be broad in nature and consider the totality of the circumstances of each specific case." *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001). In making this determination, the court should consider whether the scientific principles underlying the witness's testimony are reasonably reliable and whether the witness is qualified to testify about such matters by virtue of the witness's experience, knowledge, training, or skill. *Id.*; *see* CRE 702.

## 2. Analysis

¶ 30    Feldman asserts that Dr. Smock was not qualified to testify about the cause and manner of the victim's death because he is not a forensic pathologist and that his testimony was therefore unreliable. Whether Dr. Smock is a forensic pathologist is not dispositive of this issue, however. As discussed above, a district court's reliability determination is based on the totality of the circumstances and considers the witness's subject matter expertise. *Shreck*, 22 P.3d at 77. Dr. Smock's seventy-one-page curriculum vitae indicated that his experience includes treating or consulting with thousands of strangulation and suffocation patients, assisting in thousands of autopsies, publishing extensively in the fields of emergency and forensic medicine, and working as a police surgeon and a medical director for the Institute on Strangulation Prevention. Based on his experience, we conclude that the trial court did not abuse its discretion by admitting Dr. Smock as an expert in clinical forensic medicine and strangulation to opine that the victim's bruises were consistent with strangulation and suffocation.

¶ 31    Feldman also asserts that Dr. Smock's testimony about the victim's injuries was speculative because he did not participate in

14

the victim's autopsy but instead formed his opinion after reviewing the autopsy report years after Dr. Kobylanski performed the autopsy. However, he does not explain how Dr. Smock's lack of participation in the autopsy rendered his testimony speculative or otherwise unreliable. Indeed, even Dr. Frank, who supervised the autopsy, agreed with Dr. Smock's determination that the victim more likely died from suffocation and strangulation than from cardiac arrest. In any event, "[c]oncerns about conflicting opinions or whether a qualified expert accurately applied a reliable methodology go to the weight of the evidence, not its admissibility," *People v. Shanks*, 2019 COA 160, ¶ 12, 467 P.3d 1228, 1234, and "concerns about the degree of certainty to which the expert holds his opinion are sufficiently addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof rather than exclusion," *Est. of*

*Ford v. Eicher*, 250 P.3d 262, 266 (Colo. 2011).[4] Here, defense counsel not only cross-examined Dr. Smock vigorously but also critiqued his testimony during closing argument by highlighting his alleged lack of qualifications.

¶ 32    In addition, we reject Feldman's contention that Dr. Smock's testimony was argumentative and amounted to improper bolstering. Contrary to Feldman's assertion that Dr. Smock "repeatedly told the jury that he had 'the best' opinion and the board-certified forensic

---

[4] Feldman cites numerous cases from other jurisdictions to support his argument that Dr. Smock's testimony was inadmissible. *See Boerste v. Ellis, LLC*, No. 3:17-CV-298-BJB-CHL, 2021 WL 6101678, at *10-12 (W.D. Ky. Sept. 29, 2021) (unpublished report and recommendation) (Although Dr. Smock was eminently qualified to offer his opinions and observations regarding the plaintiff's injuries, his testimony about "police practices, towing operations, or security matters" was inadmissible because it exceeded the scope of his expertise.), *adopted*, 2021 WL 5449003 (W.D. Ky. Nov. 22, 2021) (unpublished order); *Conner v. State*, No. 46924, 2020 WL 2301190, at *4 (Idaho Ct. App. May 8, 2020) (unpublished opinion) (finding Dr. Smock's expert testimony about defensive wounds was inadmissible because of a discovery violation); *Jenkins v. Ky. Ret. Sys.*, No. 2018-CA-000395-MR, 2019 WL 4565240, at *3 (Ky. Ct. App. Sept. 20, 2019) (unpublished opinion) (affirming a decision in which a hearing officer found that Dr. Smock's testimony was "less persuasive" than that of another doctor). These cases are inapposite; it appears that Feldman cites them only because they involved Dr. Smock's testimony. His testimony in other cases has no relevance to the admissibility of his testimony in this case, and the other cases do not address Dr. Smock's qualifications in the context of this case.

16

pathologists were wrong," our review of the record shows that Dr. Smock never claimed he had the best opinion and that his only critique of the pathologists — that there were "[m]ultiple things that were missed" in the autopsy — was subject to an objection that the court sustained on the grounds that the prosecution had not disclosed such testimony to the defense before trial.

¶ 33    In sum, the record supports the district court's determination that Dr. Smock's expert testimony was admissible: His testimony was relevant and reliable, and he was qualified to opine on the cause and manner of the victim's death based on his extensive medical experience.

### C.    Denial of Motion for a Mistrial

¶ 34    Feldman asserts that the district court abused its discretion by denying defense counsel's motion for a mistrial after the jury heard inadmissible testimony.  We disagree.

### 1.    Additional Background

¶ 35    Before trial, the district court ruled that Linda Malman, the victim's aunt, could testify whether the victim had expressed "fears about anything in the marriage" but could not testify that "she was pretty sure [Feldman] threatened to kill [the victim]."  In response to

17

the prosecutor's question, "Did she ever express any fears about [Feldman]?" at trial, however, Malman testified, "She told me that when we had talked about her leaving and the options of, you know, moving and whatnot, she chuckled and she said to me, 'He'll kill me before he lets me leave.'"

¶ 36 Defense counsel objected to Malman's testimony. The district court sustained the objection and instructed the jury to disregard Malman's answer. Counsel then moved for a mistrial, which the court denied. A juror later submitted a question asking whether the victim had ever told Malman that Feldman was physically or verbally abusive toward her, but the court did not ask Malman the juror's question.

### 2. Standard of Review and Applicable Law

¶ 37 We review a district court's denial of a motion for a mistrial for an abuse of discretion. *People v. Rios*, 2020 COA 2, ¶ 22, 463 P.3d 322, 328. "Because a mistrial is 'the most drastic of remedies,' it is 'only warranted where the prejudice to the accused is too substantial to be remedied by other means.'" *Id.* (quoting *People v. Abbott*, 690 P.2d 1263, 1269 (Colo. 1984)).

18

¶ 38   "Factors relevant in considering whether a mistrial should be declared include the nature of the inadmissible evidence, the weight of the admissible evidence of guilt, and the value of a cautionary instruction." *People v. Tillery*, 231 P.3d 36, 43 (Colo. App. 2009), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011).

### 3.   Analysis

¶ 39   We perceive no abuse of discretion in the district court's refusal to grant defense counsel's motion for a mistrial based on Malman's testimony.  Though inadmissible, her testimony did not warrant a mistrial for three reasons.

¶ 40   First, as the district court noted, Malman's use of the word "chuckled" put her testimony in "a different light."  By testifying that the victim chuckled when she said that Feldman would kill her before letting her leave the marriage, Malman suggested the victim was not serious.  The statement was also fleeting; neither the prosecutor nor defense counsel referred to it (or to any other portion of Malman's testimony) during closing argument.  *See People v. Perez*, 2024 COA 94, ¶ 47, ___ P.3d ___, ___.

¶ 41   Second, it does not appear that the prosecution intentionally elicited Malman's statement.  To be sure, the prosecutor asked

19

Malman what the victim had said about her fears of Feldman. The district court, however, had previously ruled that the prosecutor could ask Malman about the victim's fears of Feldman. The prosecutor also told the court during defense counsel's motion for a mistrial that she had warned Malman before trial that the statement at issue would not be admissible. *Cf. People v. Dist. Ct.*, 767 P.2d 239, 241 (Colo. 1989) ("When a prosecuting attorney purposefully exposes the jury to inadmissible and highly prejudicial evidence, [her] conduct will not be condoned, and a new trial will be granted."); *People v. Goldsberry*, 509 P.2d 801, 804 (Colo. 1973) (same).

¶ 42    Third, the district court's curative instruction sufficiently remedied any error in the jurors' hearing Malman's statement. *See Vigil v. People*, 731 P.2d 713, 716 (Colo. 1987) ("Generally, an error in the admission of evidence may be cured by withdrawing the evidence from the jury's consideration and instructing the jury to disregard it."). Absent evidence to the contrary, we must presume that the jury followed that instruction. *See Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1088 (Colo. 2011). To the extent Feldman argues that the jury did not follow the court's instruction because

one juror submitted a question about whether Feldman had emotionally or physically abused the victim, we reject his argument. Only one juror submitted a question on this topic, and the juror may have submitted it in response to Malman's earlier statement that the victim and Feldman had fought during their marriage. Defense counsel did not object to that statement at trial, and Feldman does not challenge its admissibility on appeal. Moreover, the court went beyond instructing the jury to disregard the inadmissible testimony by precluding the prosecutor from asking Malman additional questions about whether the victim had felt afraid of Feldman emotionally and physically and whether Feldman had bullied the victim — questions the court had previously found permissible.

### D. Character Evidence

¶ 43 Feldman asserts that the district court abused its discretion by admitting improper testimony about his character. Again, we disagree.

### 1. Additional Background

¶ 44 Before trial, the district court ruled that Ben Smith, Feldman's close friend and neighbor, could testify about Feldman's allegedly

disingenuous expressions of emotions and comments regarding the victim's ailing health as evidence of motive and intent, provided he had personal knowledge and did not use the words "faking" or "lying."

¶ 45     At trial, Smith testified that he and Feldman went to a bar the week before the victim died.  When Smith asked Feldman how the victim was doing and what was making her so sick, Feldman "would do the teary-eyed and crack his voice and say how dire the situation is."  When a third person showed up, Feldman "instantly snapped out of that" and acted normally, and "it wasn't until we left the bar that he went back" to how he had been acting before the third person showed up.  Smith testified, "I did get the feeling something was really wrong, very bad, and . . . I just felt like that night I was — something bad was going to happen, and I was going to be, like, an alibi."  He also testified that he "had a bad feeling" and felt "guilty . . . .  Like I could have done something."  Defense counsel objected to these statements and moved for a mistrial, but the court overruled the objection and denied the mistrial motion.

## 2. Standard of Review

¶ 46    As noted, we review a district court's evidentiary rulings for an abuse of discretion.  *People v. Knapp*, 2020 COA 107, ¶ 31, 487 P.3d 1243, 1252.

## 3. Analysis

¶ 47    We reject Feldman's contention that Smith's testimony about Feldman's feigned emotions the week before the victim died constituted improper character evidence.  Although evidence of a person's character generally is not admissible to prove that the person acted in conformity with a given character trait on a particular occasion, CRE 404(a), "a lay witness may give a summary opinion of another person's behavior, motivation, intent, or state of mind if . . . [the] witness has personally observed the physical activity of another, and summarizes his 'sensory impressions thereof.'"  *People v. Acosta*, 2014 COA 82, ¶ 33, 338 P.3d 472, 479 (quoting *People v. Farley*, 712 P.2d 1116, 1119 (Colo. App. 1985)); *see* CRE 701.  That is what occurred in this case: The prosecution laid a sufficient foundation that Smith had personally observed Feldman's behavior and that Smith knew Feldman well enough to characterize his expressions of emotions and comments about the

victim's ailing health as disingenuous. *See Acosta*, ¶¶ 26, 45-47,

338 P.3d at 478, 481 (a witness's statement that the defendant was

"very guilty-looking" was a proper, admissible lay opinion); *cf.*

*Howard-Walker v. People*, 2019 CO 69, ¶ 34, 443 P.3d 1007, 1013

(a detective's testimony about why he thought the defendant's

girlfriend had been crying was improper because he lacked personal

knowledge).

¶ 48     Nor are we persuaded that *Liggett v. People*, 135 P.3d 725

(Colo. 2006), on which Feldman relies, requires a different

conclusion. In *Liggett*, the Colorado Supreme Court held that a

prosecutor may not ask a witness to comment on the veracity of

others by asking a "were they lying" type of question. *Id.* at 733.

Here, by contrast, the prosecutor did not ask Smith whether

Feldman had lied when discussing the victim's health; the

prosecutor merely asked Smith to characterize Feldman's

demeanor, which was relevant to prove motive and intent. *See*

*People v. Jones*, 907 P.2d 667, 669 (Colo. App. 1995) ("A lay witness

may state an opinion about another person's motivation or intent

only if the witness had sufficient opportunity to observe the person

and to draw a rational conclusion about the person's state of mind . . . .").

¶ 49 In addition, Feldman offers no supporting authority for his challenge to the admission of Smith's statements that he felt guilty and was being used as an alibi. In any event, the statements were not unduly prejudicial, as they were only a small part of Feldman's trial. Indeed, the prosecutor's closing argument did not reference any portions of Smith's testimony that Feldman challenges on appeal.

## E. Cumulative Error

¶ 50 Because we have not found any errors, the cumulative error doctrine does not apply. *See Shanks*, ¶ 76, 467 P.3d at 1245.

## III. Disposition

¶ 51 The judgment of conviction is affirmed.

JUDGE LIPINSKY and JUDGE SULLIVAN concur.